725 So.2d 1003 (1997)
Christopher Lee PRICE
v.
STATE.
CR-92-0882.
Court of Criminal Appeals of Alabama.
June 20, 1997.
Rehearing Denied November 14, 1997.
*1010 Joel L. Sogol, Tuscaloosa, for appellant.
*1011 Bill Pryor, atty. gen., and Thomas Leverette and Steve Willoughby, asst. attys. gen., for appellee.
McMILLAN, Judge.
The appellant was convicted of capital murder, see § 13A-5-40(a)(2), Code of Alabama 1975, for the intentional murder of Bill Lynn during a robbery in the first degree. He was also convicted of robbery in the first degree, a violation of § 13A-8-41, Code of Alabama 1975, for the robbery of Bessie Lynn, Bill Lynn's wife.[1] Following the guilt phase of the appellant's trial, a sentencing hearing was held before the jury. The jury returned an advisory verdict on the capital murder conviction recommending that he be put to death by electrocution. Thereafter, a separate sentencing hearing was held before the trial court, wherein the trial court initially sentenced the appellant to life imprisonment without parole[2] as to the robbery in the first degree conviction and to death by electrocution as to the capital murder conviction.
Through the testimony of Bessie Lynn and through the admission of a statement the appellant gave to authorities in Chattanooga, Tennessee, approximately one week after the offense, the State established evidence tending to show the following:
On the evening of December 22, 1991, Bill and Bessie Lynn returned to their home following a church service at the Natural Springs Church of Christ, where Bill Lynn had served as minister. The victims' home was located in the Bazemore community of north Fayette County. Bill Lynn had begun assembling Christmas toys for his grandchildren, while Bessie Lynn had dressed for bed and was upstairs in her bedroom watching television. The electricity suddenly failed and, because the security lights outside remained on, and because the electricity was still on in a neighbor's home, Bill Lynn told his wife to call the power company to report the outage. He then walked outside to check the power box. Bessie Lynn heard a noise outside and, upon looking out of her window, saw an individual in what she called a "karate stance," holding what appeared to be a sword in his right hand, high above his head in a striking position. Bessie Lynn testified that the individual was dressed completely in black. Bill Lynn yelled for his wife to telephone the police, and, upon discovering that the telephone lines had been cut, she hurried downstairs, where she picked up a candle and armed herself with a pistol that the Lynns kept in a kitchen drawer by a bank deposit bag. The bank deposit bag contained cash and checks received from an automobile parts business operated by Bill Lynn. Bessie Lynn testified that she then hurried outside and that when she did someone struck her and knocked her to the ground. She testified that she got up and fired a gunshot into the air and began calling for her husband. She found him in the yard and tried to give him the gun, telling him to shoot the people, but Bill Lynn, who had been severely wounded told her there were no bullets left in the gun. She then told her husband that she was going for help; he told her to give the culprits anything that they wanted. Bill Lynn had told his wife at that point that he knew he was going to die. Bessie Lynn, who was in their van and attempting to insert the key into the ignition, became aware of two men, one on each side of the van. They ordered her out of the van, and when she got out she was beaten with an object. One of the individuals was demanding money. They ordered her back into the house, where the two individuals, both dressed in black, demanded her money and jewelry. They took a rifle and shotgun from the house, the pistol that Bill Lynn still had, and the checks and cash from the bank deposit bag. They also ordered Bessie Lynn to give them her jewelry. She responded that she did not wear jewelry other than her two rings and asked if she might keep her wedding ring. She was *1012 instructed to take her rings off and to drop them in a bag, which they took. The culprits instructed Mrs. Lynn to remain where she was and they searched for something in the kitchen and then outside the house. Bessie Lynn testified that when the two men came back in the house, a vehicle apparently drove by the house. The two men then went out the back door, and Bessie Lynn testified that she then ran out the front door. She ran back to her husband to tell him that she was going to go for help. He asked her to hurry, and she ran to her father's house, which was located nearby. From her father's house she telephoned for help. Bill Lynn died before he reached the hospital. Bessie Lynn was treated for wounds to her head, her hands, her chest, and her thighs.
Several days later, the appellant was arrested in Chattanooga, Tennessee, where he had been visiting friends. He gave a statement to the authorities in Tennessee, admitting his participation in the offenses, but claiming that his accomplice had actually killed Bill Lynn and wounded Bessie Lynn. He subsequently gave another statement to Alabama authorities.

I.
The appellant argues that the trial court improperly failed to ask each prospective juror whether the juror had heard or was influenced by allegedly improper discussions that took place outside the courtroom during jury selection. The appellant argues that the trial court's failure violated his constitutional rights. The portion of the record containing a potential juror's testimony which alluded to the conversation, as well as the action taken by the court in response, is as follows:
"THE COURT: Do you [the prospective juror,] have any knowledge about the facts of this case?
"PROSPECTIVE JUROR: No, sir.
"THE COURT: Do you not know anything at all about it? Have you heard or read or has anything been communicated to you about it?
"PROSPECTIVE JUROR: Pardon me, but I work an owl shift. My life is different from yours. I don't mean to be impolite. It's just
"THE COURT: Well, I figuredThey talk on the owl shift?
"PROSPECTIVE JUROR: I didn't see it on the news. I'm sorry.
"THE COURT: Are you saying to the Court that you know absolutely nothing about this case?
"PROSPECTIVE JUROR: The only thing I heard was that he killed a man. That's all I've heard.
"THE COURT: That's somewhat important. Mr. S., do you feel that you would be able to sit and listen to the evidence as it comes from the witness stand and base your verdict solely upon the evidence that you hear in the courtroom and disregard any knowledge or information that you might have about the trial prior to this time and render a fair and impartial verdict both for the State of Alabama and the defendant?
"PROSPECTIVE JUROR: May I answer it this way? I believe in being honest. I'm an honest person. The United States GovernmentI got a greetings letter that said that I was to join the Army. They didn't care whether I was killed or not. I hold no partiality in any way toward anybody. I don't believe in stealing. If that answers your question, I'm trying to be nice.
"THE COURT: Well, it doesn't because I would have to unravel that and try to assume what your answer is. I would like for you to give me a yes or no answer. Would you sit as a member of the jury, if you were selected to do so, and listen to the evidence in this case, base your verdict solely upon that evidence and render a fair and impartial verdict in this case both for the State of Alabama and for the defendant?
"PROSPECTIVE JUROR: I would.
"[DEFENSE COUNSEL]: Do you have a fixed opinion as to Mr. Price's guilt or innocence?
"PROSPECTIVE JUROR: I don't even know Mr. Price. I'm sorry.
"[DEFENSE COUNSEL]: But you said that you heard something in the street that he had

*1013 "PROSPECTIVE JUROR: I heard it right out here just a while ago, that he might have killed him with an axe is all I've heard. I'm being polite now.
"[DEFENSE COUNSEL]: [Prospective juror], where did you hear that?
"PROSPECTIVE JUROR: Sitting out there in the courtroom.
"[DEFENSE COUNSEL]: Who did you hear it from?
"PROSPECTIVE JUROR: I don't know. Just somebody said thatI saidMy question was to a friend of mine. `If it's a murder trial, who killed himthe gun, the bullet or the man?' He laughed and said, well, I guess it's an axe because I understood he was killed with an ax. That's all that was said.
"[DEFENSE COUNSEL]: Would that have been another juror that you were talking with?
"PROSPECTIVE JUROR: Yes. That's all that I'm sitting with.
"[DEFENSE COUNSEL]: Do you remember who that person was?
"PROSPECTIVE JUROR: I'm sorry. I don't
"[DEFENSE COUNSEL]: White man or black man?
"PROSPECTIVE JUROR: White man.
"[DEFENSE COUNSEL]: What did he have on?
"PROSPECTIVE JUROR: Had on britches and a shirt, I guess.
"[DEFENSE COUNSEL]: Any idea what his name was?
"PROSPECTIVE JUROR: No, ma'am.
"THE COURT: Is he still sitting out there?
"PROSPECTIVE JUROR: I don't know. There was about eight of us talking.
"[DEFENSE COUNSEL]: What else did you talk about?
"PROSPECTIVE JUROR: What else did we talk about?
"[DEFENSE COUNSEL]: Uh-huh.
"PROSPECTIVE JUROR: About we were worried about the judge. He came in to eat late out there. And I just kidded them and told them some of us ought to tell him that we had just a little while to get back to eat. I'm trying to be polite now.
"[DEFENSE COUNSEL]: [Prospective juror], did you and those other eight jurors that were sitting there talking discuss anything else about this case?
"PROSPECTIVE JUROR: Not that I know of. The only thing I've been doing is joking about whatever I was saying anyway. I mean
"[DEFENSE COUNSEL]: Were there any other jokes made about anything to do with this case?
"PROSPECTIVE JUROR: Not that I know of.
"[DEFENSE COUNSEL]: But you and another juror did discuss what the murder weapon may be and someone told you it may be an ax; is that correct?
"PROSPECTIVE JUROR: Yes, ma'am.
"[DEFENSE COUNSEL]: And there were probably six other people who heard that?
"PROSPECTIVE JUROR: Oh, yeah. There was a bunch of them sitting around there.
"[DEFENSE COUNSEL]: Did they have any comment about what the weapon was?
"PROSPECTIVE JUROR: Huh-uh. No. I was running my mouth. I'm sorry.
"[DEFENSE COUNSEL]: Where do you work, [Prospective juror]?
"PROSPECTIVE JUROR: P & M Mines in Berry.
"[DEFENSE COUNSEL]: That's all I have, Your Honor.
"[PROSECUTOR]: [Prospective Juror], did you consider what was said to be serious?
"PROSPECTIVE JUROR: No, sir.
"[PROSECUTOR]: Do you think at this point that the victim was killed with an ax? Do you believe that?
"PROSPECTIVE JUROR: I'm sorry. I don't even know how he was killed.
"[PROSECUTOR]: You just assume that because it's a murder case, there had to be a murder weapon?

*1014 "PROSPECTIVE JUROR: You usually don't kill anybody without using some kind of weapon.
"[PROSECUTOR]: That's the only basis of your comments or anybody else's?
"PROSPECTIVE JUROR: Yes, sir. I had nothingI don't even know the man. I hadn't got anything against the man.
"[PROSECUTOR]: All right. That's all. Thank you.
"THE DEFENDANT: [Prospective juror], based on what you've heard here today in this court, do you think you could give me a fair trial in this case?
"PROSPECTIVE JUROR: I feelI feel like a lot of things [don't] always come out. You don't really know what makes a man do what he does. Yes, I'll render my opinion by the evidence that's given. Do you understand what I'm saying?
"THE DEFENDANT: Yes, sir.
"PROSPECTIVE JUROR: I'm saying that a lot of times things are not anywhere near like what they look like they are.
"THE DEFENDANT: But based on what you've heard, you think you could give me a fair trial in this situation?
"PROSPECTIVE JUROR: Yes. I believe in being fair to everybody.
"THE DEFENDANT: Thank you, sir.
"....
"[DEFENSE COUNSEL]: I'm going to move for a mistrial, Your Honor, based on the fact that we've got a tainted jury pool if they're sitting out there discussing murder weapons after you have admonished them to discuss nothing about this case. I don't even know who the other people were. He's indicated there was a group of people.
"[PROSECUTOR]: I think he could identify who was there, Judge. He got to be evasive. He said it was a friend of his. Surely he knows his friend.
"[DEFENSE COUNSEL]: And then he indicated there were six to eight other people all sitting around. If they were participating in the conversation, who else was still around them to hear that was not even participating?
"[PROSECUTOR]: Well, I think before the court would rule on that, he would need to inquire of any jurors that had heard any conversations. He's assuming that other people heard it, but he doesn't really know that.
"[DEFENSE COUNSEL]: He was pretty clear that they were all talking about it.
"[PROSECUTOR]: I didn't think so.
"THE COURT: Well, as I say, I think the voir dire up to this point has been extensive. I think it has been fair. You've had the opportunityfrom the various jurors who have been in here, they have heard, whether they heard it today or this morning or the times past, some discussion of the case. It was that type of case. And I don't think any possible remarks as he has presented [them] would be sufficient to taint a jury venire to the point of a mistrial. So I'll deny your motion.
"[PROSECUTOR]: I might say this, Your Honor. We would agree that he could be removed at this point. He seems to have a penchant for kind of lecturing everybody that asks him a question.
"THE COURT: Well, I think it's kind of obvious that if we didn't want to `be nice,' as he kept saying, that we could designate his personality in a very unfavorable light. I think he's shown through real clear as to who and what he is.
"[DEFENSE COUNSEL]: I would have no problems with him being removed. I would except to your denial of a mistrial for the record.
"THE COURT: Would you let this man be removed?
"[DEFENSE COUNSEL]: In a New York second.
"(Off-the-record discussion.)
"[PROSECUTOR]: Would the Court instruct him that he's to leave and not have any further contact with any other jurors?
"THE COURT: Ask him to come back in, please.
"(Prospective juror ... entered the law library.)
"THE COURT: [Prospective juror], you will be excused from further service on the *1015 jury. And we would ask you, please, to leave the courthouse and not communicate with anyone else.
"PROSPECTIVE JUROR: All right, sir."
The prospective juror clearly informed the court that the conversation he had with the other prospective jurors was in jest. Moreover, the only subject matter concerned the possibility that the victim had been killed with an ax. In the present case, the evidence at trial was clear that a knife and a sword had been used either separately or together as the murder weapon or weapons. There was no issue raised concerning the murder weapon; thus, any initial speculation that an ax may have been the murder weapon could not have prejudiced the appellant.
In Riddle v. State, 661 So.2d 274 (Ala.Cr. App.1994), the bailiff had informed the trial court that a juror had told him that another juror had discussed the case with seven to eight people in the jury room. The juror who had conducted the discussion was identified and it was determined that the discussion occurred following voir dire but before the selection of the jury. The trial court questioned the juror concerning what she had reportedly said to the other potential jurors, i.e., that she had heard that the appellant had beaten his stepdaughter. The empaneled jurors and the remaining veniremembers were questioned by the trial court as to whether any of them had heard the facts of the case being discussed; however, before any responses could be made, defense counsel moved for a mistrial. Four veniremembers, who were not empaneled to sit on the jury, responded that they had heard the facts of the case being discussed; the trial court excused these veniremembers. Defense counsel thereafter renewed his motion for a mistrial, alleging that only four veniremembers had been identified while the bailiff had reported that six to seven people were involved in the conversation. The trial court again denied the motion for mistrial. This Court found that the trial court's denial was proper because the "damage was controlled" and the jury that ultimately sat on the appellant's case was not influenced by the comments. This Court, quoting Holland v. State, 588 So.2d 543, 546, 548-49 (Ala.Crim. App.1991), wrote:
"`A motion for mistrial "is addressed to the sound discretion of the trial court, and its ruing will not be reversed in the absence of a clear showing of abuse of discretion." Ex parte Jefferson, 473 So.2d 1110, 1114 (Ala.1985), cert. denied, 479 U.S. 922, 107 S.Ct. 328, 93 L.Ed.2d 300 (1986). In cases involving juror misconduct, a trial court generally will not be held to have abused its discretion "where the trial court investigates the circumstances under which the remark was made, its substance, and determines that the rights of the appellant were not prejudiced by the remark." Bascom v. State, 344 So.2d 218, 222 (Ala.Cr. App.1977). However, the trial judge has a duty to conduct a "reasonable investigation of irregularities claimed to have been committed" before he concludes that the rights of the accused have not been compromised. Phillips v. State, 462 So.2d 981, 990 (Ala. Cr.App.1984). His investigation should include a "painstaking and careful" inquiry into the alleged juror misconduct. Lauderdale v. State, 22 Ala.App. 52, 54, 112 So. 92, 93 (1927).
"`....
"`... [W]hen the trial judge acts promptly to investigate the circumstances surrounding the making of an inherently prejudicial remark by a veniremember, determining specifically whether the remark was made and whether the remark had a prejudicial effect on those who, ultimately selected to serve as jurors, heard it, there is no error in the denial of a motion for mistrial based on jury contamination.
"`....
"`"The standard for determining whether juror misconduct requires a new trial is set forth in Roan v. State, 225 Ala. 428, 435, 143 So. 454, 460 (1932) [citing Lauderdale with approval]."
"`"The test of vitiating influence is not that it did influence a member of the jury to act without the evidence, but that it might have unlawfully influenced that juror and others with whom he deliberated, and might have unlawfully influenced the verdict rendered.'"
*1016 "`Ex parte Lasley, 505 So.2d 1263, 1264 (Ala.1987).'" Riddle v. State, 661 So.2d at 276. (material in brackets added in Holland) (emphasis added in Lasley omitted). See also Burell v. State, 680 So.2d 975, 979 (Ala. Crim.App.1996) (juror's undisclosed acquaintance with the appellant's brother did not require a mistrial).
In the present case, the potential juror who had been privy to the conversation was removed for cause. Thereafter, defense counsel asked a number of potential jurors whether they had heard such a conversation taking place; however, none indicated that they had and defense counsel refrained from asking any other potential jurors whether they too had heard the conversation. Although a reversal may be mandated when juror misconduct "might have influenced the verdict," which "casts a `light burden' on the defendant," Ex parte Lasley, 505 So.2d 1263, 1264 (Ala.1987), in the present case the appellant has not met even this burden. In Riddle v. State, 661 So.2d at 276-77, this Court noted that, as in the present case, "the defense did not request individual voir dire of the empaneled jury. There is no indication in the record that individual voir dire was necessary." Id., citing Brown v. State, 571 So.2d 345, 350-52 (Ala.Cr.App.), cert. quashed, 571 So.2d 353 (Ala.1990), vacated, 501 U.S. 1201, 111 S.Ct. 2791, 115 L.Ed.2d 966 (1991). Thus, in the present case, where the potential jurors who were not struck for cause all indicated that they could eliminate the influence of any previous feelings and could render a verdict according to the evidence, Rowell v. State, 570 So.2d 848, 855 (Ala.Cr.App.1990), and the subject matter of the conversation concerned an aspect of the case that was not contested by either party, the trial court's decision to deny the motion for a mistrial and his failure to sua sponte question the venire panel was not erroneous.

II.
The appellant argues that comments made by the prosecutor and the trial court allowed the jury to convict him of capital murder without finding that he intended to kill the victim, in violation of the state and federal Constitutions, as well as Alabama caselaw. Specifically, the appellant refers to portions of the trial court's charge wherein he explains the intent element of capital murder, the relationship between the intent element and accomplice liability, and the definition of "intent" as it applies to the lesser included offense of felony murder. The appellant seems to argue, not that the trial judge's charges were legally incorrect, but rather that distinguishing between the legal concepts would necessarily be confusing and misleading to a jury. The appellant alludes to a portion of the trial judge's charge where he discusses the element of intent in a case involving an accomplice to capital murder, stating, "He has to have actually formed the intent to murder as opposed to being surprised by the act of some fellow actor in a robbery or other crime.... It is not enough that he was merely a bystander who was surprised by the acts of another person or something of that nature." The appellant further argues that the confusion arises from the trial judge's subsequent charge to the jury on the lesser included offense of felony murder, wherein he stated that "in a felony murder a person can be guilty of a felony murder even if they had no intent that anyone would be killed and that just to that individual's total surprise another participant killed a person without their participation, without their intent, without their plan to do so, but they did plan to commit the underlying crime." The appellant argues that this confusion was finally compounded by the prosecutor's closing argument to the jury that:
"He was in it up to his eyeballs from the very beginning to the very end.... Under either theory of capital murder, either that Chris Price himself wielded this weapon which inflicted wounds on Bill Lynn and killed him, which we feel the evidence sustains, either that way, if you should decide in your deliberations under the judge's charge that he merely was there and only intended to kill although he did not wield this weapon, there is still evidence to support that he knew what was going to happen, that he supported what was going to happen, and in no way was that any surprise to Chris Price of the outcome. Nothing surprised him."
*1017 Although the appellant makes this argument on appeal, he never objected to any of the comments at the trial court level; therefore, his claim of error must rise to the level of plain error under Rule 45A, Ala. R.App.P. Although his failure to object previously does not preclude his raising this matter on appeal, it does weigh against a finding of prejudice. Kuenzel v. State, 577 So.2d 474, 489 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991).
The record indicates that the trial court charged the jury as follows:
"In order to be guilty of capital murder, the person on trial, whether that person physically committed the act which proved fatal or not, must have formed an intent in his mind to participate in the capital murder, the actual killing of that person, whether the person on trial physically committed the act or not or whether he merely stood by ready to take up the killing if necessary or to assist in the killing, which, in fact, was perpetrated by another. He has to have actually formed the intent to murder as opposed to being surprised by the act of some fellow actor in a robbery or other crime. That requires that an individual specifically have informed an intent to commit a murder, distinguishes capital murder from the other types of homicide, specifically felony murder.
"In this case the defendant is charged with capital murder. He is charged with participating in the death of Bill Lynn intentionally while engaged in robbery in the first degree. Whether or not he physically committed the act which proved to be fatal, he had to be a participant in the act of killing Bill Lynn either by intentionally killing himself or participating in the events with complicity by assisting or standing by to assist or encouraging or aiding or being a part in the actual, intentional murder of Bill Lynn. It is not enough that he was merely a bystander who was surprised by the acts of another person or something of that nature.
"A person commits the crime of intentional murder if, with the intent to cause the death of another person, he causes the death of that person or yet another person. A person acts intentionally then when, with respect to a result or to conduct, his purpose is to cause that result or to engage in that conduct. So then when we speak of someone acting intentionally, we're speaking of someone acting with respect to a result with a purpose to cause that result, what many of us in Alabama would say, that a person meant to do that which they did. If they meant to do it, if their purpose was to do it and they carried it out, then that's the type of intent that we're speaking of. So a person accused of an intentional homicide must intentionally, as opposed to negligently, accidentally, or recklessly cause the death of the deceased in order to invoke the capital statute.
"Now, in this case, as I say, if the defendant, during the commission of a robbery, intentionally killed Bill Lynn himself, then under the laws of the State of Alabama, he would be guilty of capital murder if he was engaged in committing robbery in the first degree.
"Now, the fact that someone died or is killed during the commission of a robbery does not automatically provide the intent in the instance of capital murder. The intent to kill must be real and specific in order to invoke the capital statute. In determining whether or not a person acted intentionally, of course, the jury has a right to look at all of the facts and circumstances surrounding the death of the person who is now deceased with a view of determining how that individual met his or her death and what might have been the intention of anyone who inflicted the wound or wounds or participated in the acts which caused the death of that person.
"It is also a fundamental point in the state of Alabama that, when, by pre-arrangement or even on the spur of the moment, two or more persons intentionally determine to enter upon a common enterprise or adventure and a capital offense is contemplated in their mind, then if that purpose and collusion to kill is carried out, each would be guilty of the offense committed, whether that individual did any *1018 overt act or not. This rests upon the principle that anyone who, with the intent to participate in the intentional killing, is then present and encouraging, aiding, abetting or assisting the active perpetrator in the commission of that offense, is a guilty participant and in the eyes of the law is equally guilty as the one who actually did the physical act.
"This community of purpose or collusion in the killing need not be established by direct, positive testimony due to its inherent nature, but a jury must determine whether or not there has been such a collusion and intent on the part of the defendant and its extent, if any, from all of the evidence and the testimony in the case.
"Now, if a person actively participates in the robbery or intending to assist and encourage, aid, abet or in any way carry out or help perpetrate an intentional murder during the commission of that robbery, then that individual would be guilty whether or not he personally committed the fatal act, but he could not be guilty of capital murder if he did not take some part in and form the intent to participate in the killing."
(Underlined portions are those cited by the appellant.)
There was no error in the trial court's charge on intent as it relates accomplice liability for a capital offense or for the offense of felony murder. These charges were clearly necessary to distinguish that element as it relates to the charged capital offense and the lesser included offense of felony murder. Starks v. State, 594 So.2d 187, 193-94 (Ala. Cr.App.1991) (the trial court failed to properly instruct the jury as to the intent element of capital murder, thereby failing to clearly distinguish that offense from the lesser included offense of felony murder). Davis v. State, 440 So.2d 1191, 1194 (Ala.Cr.App. 1983), cert. denied, 465 U.S. 1083, 104 S.Ct. 1452, 79 L.Ed.2d 770 (1984) (the trial court had properly charged the jury as to the intent necessary for capital murder, the felony murder doctrine, and as to the distinction between the intent required for a capital felony and that required for the lesser included offense of non-capital murder); Womack v. State, 435 So.2d 754, 763 (Ala.Cr.App.), aff'd, 435 So.2d 766 (Ala.), cert. denied, 464 U.S. 986, 104 S.Ct. 436, 78 L.Ed.2d 367 (1983) (the trial court properly instructed the jury as to the "intent to kill requirement" by instructing the jury that the felony murder doctrine was relevant only as a lesser included offense of noncapital murder, and that the jury could not convict the defendant for capital murder without finding beyond a reasonable doubt that he had possessed the intent to kill). See also Ex parte Brown, 686 So.2d 409 (Ala.1996), cert. denied, 520 U.S. 1199, 117 S.Ct. 1558, 137 L.Ed.2d 705 (1997).
This charge was also proper given the evidence presented at trial; the State's theory of the case was that the appellant and his accomplice committed the capital murder of Bill Lynn, while the appellant's theory of the case was that he merely intended to commit a robbery but never intended to, and never actually participated in, the murder of Bill Lynn. Moreover, it was permissible for the prosecutor to argue the State's theory of the case as supported by the evidence to the jury. The State had presented sufficient evidence to provide a foundation for the jury to consider the offense of capital murder. "`[A] defendant is entitled to a charge on a lesser included offense if there is any reasonable theory from the evidence that would support the position.' Ex parte Oliver, 518 So.2d 705, 706 (Ala.1987). This is true regardless of `however weak, insufficient, or doubtful in credibility' the evidence is concerning that offense. Chavers v. State, 361 So.2d 1106, 1107 (Ala.1978)." Fletcher v. State, 621 So.2d 1010, 1019 (Ala.Cr.App.1993). A trial court should also give a charge as to a lesser included offense even when "`"the evidence supporting the defendant's position is offered by the State." Silvey v. State, 485 So.2d 790, 792 (Ala.Cr.App.1986).'" Fletcher v. State, supra, quoting Starks v. State, 594 So.2d 187, 195 (Ala.Cr.App.1991). Furthermore, the prosecution may properly argue to the jury its version of the facts and evidence that support the State's theory of the case. "When these comments are examined in light of the entire record, it is clear that the prosecutor's purpose in making these statements was to comment on evidence in this *1019 case and to draw legitimate inferences therefrom; specifically, to point out the weaknesses in the appellant's theory of the case, as established by the appellant's testimony." Gaddy v. State, 698 So.2d 1100 (Ala.Cr.App. 1995), aff'd, 698 So.2d 1150 (Ala.1997). Thus, there was no error as to this claim.

III.
The appellant alleges that the trial court erred in its instructions to the jury during the guilt phase of the trial concerning statements he made to the police, because, he says, the trial court failed to inform the jury that it could find the statement involuntary and, therefore, disregard it. The record indicates that the appellant failed to raise this issue at the trial court level; therefore, this claim must amount to plain error in order to be reviewable on appeal. Rule 45A, Ala. R.App.P.
The trial court's instructions to the jury concerning the statements made by the appellant, are as follows:
"Of course, there has been some testimony with regard to statements alleged to have been made by the defendant. And with regard to any of those statements and the weight or credibility that you would give to such statements, you may consider all of the facts and circumstances which surround the taking of such a statement in deciding the weight or credibility which you would give to that statement, including the totality of the circumstances, both in the statement itself and of the presentation of that statement before you through the evidence.
"The weight and credibility to be given to any statements alleged to have been made by a defendant is for the consideration of the jury."
Despite the appellant's contention that this charge was erroneous because it failed to inform the jurors of their duty to determine the voluntariness of the statements, the instructions properly informed the jury it was to consider any pertinent facts and circumstances in determining the weight and credibility to be given to the statements. The trial court's instructions did not inform the jury that the court had already determined the voluntariness of the confession, see Ex parte Singleton, 465 So.2d 443 (Ala.1985), but rather explained to the jury that it was the trier of facts as to this evidence. See also Bush v. State, 523 So.2d 538 (Ala.Cr.App.1988). The trial court did not insinuate that the jury should accept the appellant's statement as credible based on the trial court's prior ruling that the statement was voluntary. See Gaddy v. State, 698 So.2d at 1121, quoting Jackson v. State, 674 So.2d 1318, 1325 (Ala.Cr.App.1993), aff'd as to conviction, reversed and remanded as to sentencing, 674 So.2d 1365 (Ala.1994). "`Correctly stated, whether a confession was voluntary rests initially with the trial court; once the trial court makes the preliminary determination that the confession was voluntary, it then becomes admissible into evidence. Thereafter, the jury makes a determination of voluntariness as affecting the weight and credibility to be given the confession. Lewis v. State, 295 Ala. 350, 329 So.2d 599 (1976).'" Jackson v. State, supra, at 1325, quoting Ex parte Singleton, 465 So.2d at 446 (emphasis original).
In the present case, the trial court's charge to the jury "did not misinform the jury of the law, did not affect the appellant's substantial rights, did not constitute prejudicial error, and, therefore, did not rise to the level of plain error." Gaddy v. State, 698 So.2d at 1122.

IV.
The appellant argues that the trial court's charge as to the State's burden of proof at both stages of trial violated the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and the Alabama Constitution. Specifically, the appellant argues that during the guilt phase the trial court instructed the jury on the wrong standard, and that thereafter at the penalty phase the trial court compounded the error by referring again to the charge given during the guilt phase rather than giving a full charge on reasonable doubt.
The appellant argues that, during the penalty phase, one of the comments the trial court made concerning the reasonable doubt *1020 standard was "wholly improper." The record indicates that, following the trial court's charge to the jury during the guilt phase, defense counsel objected to the court's use of the phrase "to a moral certainty," on the basis that it violated Cage v. Louisiana, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990). The trial court thereafter gave curative instructions to the jury and polled the jurors. As to the trial court's charges to the jury concerning reasonable doubt, the appellant argues that, as the charges referred to the original definition and were phrased in an abbreviated fashion, the importance of that standard was diminished; furthermore, the appellant argues that this error was aggravated by the trial court's reference again during this charge to the phrase "to a moral certainty."
The record indicates that the trial court charged the jury that the State was required to prove the appellant's guilt beyond a reasonable doubt. He repeated this standard on a number of occasions in connection with various legal concepts, such as presumption of innocence, the charges contained in an indictment, and the defendant's basic rights. Thereafter, he defined the term "reasonable doubt" for the jury as follows:
"Now, all of us from the outset have continued to use the term `reasonable doubt.' What is reasonable doubt or beyond reasonable doubt? First, a reasonable doubt is rather self-explanatory. It's a doubt for which a reason can be given.
"Beyond a reasonable doubt is such a simple term it does not always help to try to explain it any further. It's rather self-explanatory. However, it might help some to say that the doubt which would justify an acquittal must be a doubt which arises from the evidence or from a lack of evidence or from contradictory evidence, and it would be a doubt which remains after a careful consideration of all the evidence in the case. The doubt would justify an acquittal. The doubt which would justify an acquittal cannot be a mere fanciful or vague or conjectural or speculative, but it must be a reasonable doubt which comes from the evidence or comes from a lack of evidence.
"If, after considering all of the evidence in this case, you have an abiding conviction of the truth of the charge and you're convinced beyond a reasonable doubt, then it would be your duty to convict the defendant. On the other hand, if, after reviewing all of the evidence, you do not have an abiding conviction of the truth beyond a reasonable doubt, then in that event you cannot convict the defendant.
"So you will observe, ladies and gentlemen, that the law does not require the State to prove a person guilty beyond all doubt, but simply beyond a reasonable doubt.
"Of course evidence which gives rise to a guess or conjecture or suspicion of guilt would be insufficient. The law simply does not allow a person to be guessed guilty or guessed not guilty. The law requires a jury to take the body of evidence and to study it and to scrutinize it and to impartially consider it and ask themselves the question: Did the State of Alabama by the evidence in this case prove the defendant guilty beyond a reasonable doubt? If they did, they're entitled to a verdict of guilty, and if they did not, they should not have a verdict of guilty."
Later in the trial court's oral charge during the guilt phase, and just before the end of these charges, the trial court explained to the jury that it was not to consider any sentencing matter during those deliberations. The trial court stated as follows:
"Let me admonish you that at this time you must remember the question before you is this: Did the State by the evidence in this case prove beyond a reasonable doubt and to a moral certainty that the defendant in this case, Christopher Price, capitally murder, as I have defined that term to you, Bill Lynn? Yes or no. Did the State prove that beyond a reasonable doubt."
(Emphasis added.)
During the trial court's oral charge to the jury at the sentencing phase, the trial court incorporated by reference the charges given to the jury earlier during the guilt phase on the reasonable doubt standard. The reference by the trial court to the phrase "to a *1021 moral certainty" was made during his charge in relation to the burden of proof of aggravating circumstances. The trial court charged the jury:
"In order to consider an aggravating circumstance, it is necessary that the jury unanimously agree upon its existence. All twelve jurors must be convinced beyond a reasonable doubt and to a moral certainty that an aggravating circumstance exists in order for you to consider that aggravating circumstance in determining what the sentence should be."
The record further indicates that, following the charge to the jury at the guilt phase, the prosecutor approached the bench and an off-the-record discussion ensued. The trial court then gave curative instructions to the jury, following which defense counsel made a motion for a mistrial based on the trial court's use of the phrase "to a moral certainty," and the trial court individually polled the jurors as to whether they could disregard the initial definition of the term and follow the corrected instructions. Each juror replied that he or she could do so. No objection was made by the appellant or defense counsel to the use of the phrase "to a moral certainty" during the charge to the jury at the sentencing phrase.
The use of the term "moral certainty" alone in defining reasonable doubt did not create the error defined and discussed in Cage v. Louisiana, supra; rather, it was the use of this term in conjunction with other terms, such as "grave uncertainty" and "actual substantial doubt," that served to lessen the burden of proof. Moreover, the rule of law expounded in Cage v. Louisiana, supra, has been subsequently analyzed by the United States Supreme Court in Victor v. Nebraska, 511 U.S. 1, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994). This court discussed Victor in Arthur v. State, 711 So.2d 1031, 1062 (Ala.Crim.App.1996):
"`In Cage v. Louisiana, [498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990)], the United States Supreme Court found that if the instruction equated "reasonable doubt" to "grave uncertainty," and "actual substantial doubt" and stated that what was required was "moral certainty" a reasonable jury could interpret the instruction to allow a lesser degree of proof to convict than that required by the Due Process Clause. It was the use of all three phrases in conjunction with each other that the Supreme Court determined was unconstitutional in Cage. Gaskins v. McKellar, 500 U.S. 961, 111 S.Ct. 2277, 114 L.Ed.2d 728 (1991).'

"Sockwell v. State, 675 So.2d 4, 23 (Ala.Cr. App.1993). However, where some of the terminology found offensive in Cage v. Louisiana, supra, is used in a reasonable doubt instruction, reversible error does not automatically result. Stewart v. State, 601 So.2d 491 (Ala.Cr.App.1992), reversed in part and remanded on other grounds, 659 So.2d 122 (Ala.1992); Smith v. State, 588 So.2d 561, 562 (Ala.Cr.App.1991); Williams v. State, 601 So.2d 1062 (Ala.Cr. App.1991), affirmed without opinion, 662 So.2d 929.
"Following the decision in Cage v. Louisiana, supra, the United States Supreme Court re-examined the propriety of a jury instruction concerning the reasonable doubt standard in Victor v. Nebraska, 511 U.S. 1, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994).
"`In Victor v. Nebraska, the Supreme Court accepted ... [the] premise that "moral certainty," standing alone, might not be recognized by modern jurors as a synonym for "proof beyond a reasonable doubt." 511 U.S. at 14, 114 S.Ct. at 1247. However, the Court determined that when the phrase "moral certainty" was used in conjunction with the other language explanatory of the standard of proof required to convict, it was not unconstitutional.
"`The moral certainty language cannot be sequestered from its surroundings. In the Cage ... instruction, the jurors were simply told that they had to be morally certain of the defendant's guilt; there was nothing else in the instruction to lend meaning to the phrase. Not so here. The jury ... was told that a reasonable doubt is "that state of the case which, after the entire comparison and consideration of all the evidence, *1022 leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction, to a moral certainty, of the truth of the charge." The instruction thus explicitly told the jurors that their conclusion had to be based on the evidence in the case.'

"`Victor v. Nebraska, 511 U.S. at 16, 114 S.Ct. at 1248 (emphasis in original) (citation omitted).'

"Gaddy v. State, 698 So.2d 1138-39."
Arthur v. State, 711 So.2d at 1063.
Thus, the United States Supreme Court in Victor v. Nebraska held that the inclusion in a charge of the term "moral certainty" did not, without more, render a reasonable doubt instruction unconstitutional.
"[T]he Court in Victor also stated, `The Constitution does not dictate that any particular form of words be used in advising the jury of the government's burden of proof, so long as "taken as a whole, the instructions correctly conveyed the concept of reasonable doubt." Holland v. United States, 348 U.S. 121, 140, 75 S.Ct. 127, 138, 99 L.Ed. 150.' 511 U.S. at 22, 114 S.Ct. at 1251. The Court thereby reviewed the jury instruction under attack in the context of the entire charge and held that the inclusion of the `moral certainty' phrase did not render the instruction unconstitutional. 511 U.S. at 22, 114 S.Ct. at 1251."
Williams v. State, 710 So.2d 1276 (Ala.Cr. App.1996).
A review of the trial court's entire charge in the present case reveals that the jury was properly instructed as to the reasonable doubt standard and as to the State's burden of proof in establishing a prima facie case. These instructions "provided a sufficient context to lend meaning to the term `moral certainty' by relating this phrase to a conclusion based only upon a fair and impartial consideration of all of the evidence [, and] there is no reasonable likelihood that the jurors applied the instruction concerning reasonable doubt in an improper manner." Williams v. State, supra, at 1306. See also Ex parte Slaton, 680 So.2d 909, 920-21 (Ala. 1996), cert. denied, ___ U.S. ___, 117 S.Ct. 742, 136 L.Ed.2d 680 (1997) (the Alabama Supreme Court found no error in the appellant's claim that the trial court's reference to the term "moral certainty" during the guilt phase and then again subsequently during the sentencing phase constituted reversible error).

V.
The appellant argues that the trial court's refusal to exclude three prospective jurors, as well as its exclusion of five other prospective jurors, all based on allegedly erroneous applications of Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), violated his constitutional rights to a fair trial, due process, and to a fair and impartial jury.

A.
The appellant first argues that a particular potential juror, who he claims indicated through her voir dire questioning that she would be unable to consider life without parole in determining sentencing, should have been excluded on a challenge for cause. However, a review of the record as to this juror's statements on voir dire examination indicates that she stated that she could consider life imprisonment without parole, although her personal preference was toward the death penalty. This potential juror was questioned during voir dire as follows:
"THE COURT: The defendant in this case is charged with what is known as a capital offense. This means that if, after a jury has been empaneled and held the evidence in this case, they return a verdict of guilty at a sentencing phase of the case, they would be called upon to then recommend to the Court one of two punishments, either life without parole or death. If you were a member of this jury and it reached that phase, would you be able to consider both of those options?
"PROSPECTIVE JUROR: I would consider it, but then I'd think about the death penalty because I think eye for an eye and [a] tooth for a tooth.
"THE COURT: You're saying that you would consider life without parole, but that you would be inclined to assess the death penalty?

*1023 "PROSPECTIVE JUROR: (Nodding head.)
"THE COURT: Have you heard anything about the facts of this case? Do you have any knowledge about the case at all?
"PROSPECTIVE JUROR: No.
"THE COURT: Have you read about it, heard it on the news?
"PROSPECTIVE JUROR: Well, that's the only thing I've heard.
"THE COURT: But you do have some general knowledge about the case?
"PROSPECTIVE JUROR: Uh-huh.
"THE COURT: If you were selected to sit as a member of the jury, would you be able to disregard what you now know and have heard about the case and listen to the evidence as it comes from the witness stand and base your verdict solely upon the evidence that you hear here in the courtroom and the law that will be charged to you that applies to this case and render a fair and impartial verdict both for the State of Alabama and the defendant based solely upon the evidence?
"PROSPECTIVE JUROR: I think I would, but I'd stillif it come down to that, I think that I would. You know, I'd probably go with the death rather than just the life because I mean it wouldn't be anything to just life, you know, without parole.
"THE COURT: All right.
"[DEFENSE COUNSEL]: [Prospective juror], let me make sure I understand what you're saying. If, upon conviction for a murder, specifically a murder during robbery, that you would feel the only appropriate punishment was the death penalty?
"PROSPECTIVE JUROR: No. I would consider, you know, all of thethat y'all brought forth and all, but I would still keep that in mind.
"[DEFENSE COUNSEL]: The criteria would be that you would consider one or the other, but what I need to know is would youdo you think that a conviction in a murder case by robbery, that the appropriate punishment would only be the death penalty?
"PROSPECTIVE JUROR: I still think that because he didn't have to kill the man.
"[DEFENSE COUNSEL]: When you say an eye for an eye and a tooth for a tooth, you feel like you take a life, your life should be taken?
"PROSPECTIVE JUROR: That's what the Bible says.
"[DEFENSE COUNSEL]: That's a strong religious conviction that you hold?
"PROSPECTIVE JUROR: That's what I've always been taught.
"[DEFENSE COUNSEL]: That is something that you would carry with you into the jury box if you were selected?
"PROSPECTIVE JUROR: I don't know that I would, but like I said, that is still in the back of my mind.
"[DEFENSE COUNSEL]: Okay. Thank you.
"....
"[PROSECUTOR]: ... If the judge says that you should consider both sentences in recommending what he should impose of a sentence, that you should consider a sentence of death orand also consider a sentence of life without parole and that would depend on what the circumstances were, could you do that?
"PROSPECTIVE JUROR: Yeah.
"[DEFENSE COUNSEL]: But it's your belief that an eye for an eye and a tooth for a tooth would shadow
"PROSPECTIVE JUROR: Well, I can stillYou know, I can still go along with the judge on everything that's been brought out.
"[DEFENSE COUNSEL]: You could listen?
"PROSPECTIVE JUROR: Yeah.
"[DEFENSE COUNSEL]: But when it comes to a conviction, if you're asked in the second phase to make a choice, to you the only appropriate punishment would be the death penalty. Is that what you're saying?
"PROSPECTIVE JUROR: That's what I believe.
"[DEFENSE COUNSEL]: Thank you.

*1024 "THE COURT: You may be excused.
"(Prospective juror ... exited the law library.)
"[DEFENSE COUNSEL]: I'd move to challenge [prospective juror] for cause, Your Honor, based on the fact that in her mind the only appropriate punishment for a murder conviction upon robbery would be the death penalty.
"[PROSECUTOR]: I think what the criteria is, judge, would she consider both and she said that she would.
"[DEFENSE COUNSEL]: She also said it would impair it; it would color how she viewed what you said.
"THE COURT: I think she says that she has a strong belief that in certain instances the death punishment is appropriate, but I think she in each instance always qualified it and said that she would consider life without parole. So your challenge will be denied.
"[DEFENSE COUNSEL]: We except."
This prospective juror merely indicated a personal preference and tendency toward imposing the death penalty in a capital murder conviction. Such a preference, where the potential juror indicates that he or she could nonetheless consider life imprisonment without parole is not improper and it does not indicate that the juror is biased.
"[A] veniremember's personal feelings as to the law are immaterial unless those feelings are so unyielding as to preclude the veniremember from following the law as given in the court's instructions. `A veniremember who believes that the death penalty should automatically be imposed in every capital case should be excused.' Martin v. State, 548 So.2d 488, 491 (Ala. Cr.App.1988), aff'd, 548 So.2d 496 (Ala.), cert. denied, 493 U.S. 970, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989). However, veniremembers who favor the death penalty should not be excused for cause where they indicate they can follow the court's instructions. Id."

Smith v. State, 698 So.2d 189 (Ala.Cr.App. 1996), aff'd, 698 So.2d 219 (Ala.1997).

B.
In the course of arguing that this potential juror's preference for the death penalty was so strong as to support a challenge for cause, the appellant also refers to two other potential jurors who also allegedly expressed an inability to consider the sentence of life imprisonment without parole. One of these prospective jurors had been excused from the venire before the striking process and was not included in the strike list. However, that prospective juror's granddaughter was also a member of the venire and it is apparently the granddaughter to whom the appellant refers. This prospective juror was examined in combination with the other potential juror who the appellant complains also expressed an inability to consider life imprisonment without parole as a penalty and echoed her sentiments as to the punishment for capital murder. The appellant failed to challenge either of these prospective jurors for cause. See Rule 45A, Ala.R.App.P. Moreover, he entered no peremptory strike against one, and the other served on the jury as an alternate but did not take part in the jury's deliberations. Both jurors indicated that they would consider all the evidence and mitigating circumstances in determining which sentence would be the most appropriate in the present case. The appellant complains because one of the potential jurors, in response to one of his questions, indicated her preference for the death penalty and stated that, if that penalty was appropriate, she would automatically vote for that sentence. However, a review of the questioning in its entirety and her explanation of the manner in which she would consider the evidence reveals that she was not so biased in favor of the death penalty that she could not consider the sentence of life imprisonment without parole. See Pierce v. State, 576 So.2d 236, 245-46 (Ala.Cr.App. 1990), cert. denied, 576 So.2d 258 (Ala.1991), remanded, 586 So.2d 1005 (Ala.Cr.App.1991), aff'd. on return to remand, 612 So.2d 514 (Ala.Cr.App.), aff'd, 612 So.2d 516 (Ala.1992), cert. denied, 510 U.S. 872, 114 S.Ct. 201, 126 L.Ed.2d 158 (1993) (prospective jurors who indicated on individual questioning that they would automatically vote for the death penalty were subsequently questioned and indicated *1025 that they could consider all the evidence presented at the sentencing hearing and follow the trial court's instructions; defense counsel's challenge for cause as to these jurors was properly denied). In the present case, a review of the entire questioning indicates that the failure of the trial court to remove these jurors sua sponte was not plain error.

C.
The appellant also argues that the trial court erred by granting five of the prosecutor's challenges for cause of prospective jurors, based on their views concerning the death penalty. One of these five potential jurors was challenged without exception, the removal of another was specifically objected to as the removal of a black potential juror, while the grounds for the objections to the challenges of the remaining three are unclear.
Three of the potential jurors indicated clearly that they would never return an advisory verdict of the death penalty and that they could not consider that option. Although the appellant argues that their removal was improper because, he says, they were never specifically asked whether they could obey their oath, notwithstanding their views on capital punishment, the record indicate that these potential jurors were fully informed of what their duties as jurors would be in considering all of the evidence, following the trial court's instructions, and arriving at an advisory verdict.
Another of these prospective jurors, during her questioning, gave one possibly equivocal response concerning whether she could look at both sentencing options; however, she subsequently reaffirmed her firm stand against the imposition of the death penalty.
The last of these prospective jurors was extensively questioned because, on follow-up questioning by defense counsel, he stated that the option of the death penalty "could pass through [his] mind." Defense counsel then echoed the potential juror's statement, acknowledging that he could then consider that option, to which the potential juror responded, "Yes." The trial court then questioned the potential juror in order to clarify his responses and explain his duty to consider the death penalty. The potential juror then responded that he could never consider imposing or recommending the death penalty, but apparently he could consider only the abstract concept of the death penalty.
Each of these potential jurors was fully informed as to their prospective duties and questioned as to the effect the consideration of the imposition of the death penalty might have on their ability to serve as a fair juror. These five jurors explained that they could not, under any circumstance, consider the death penalty as a possible sentence and were properly excluded. Witherspoon v. Illinois, supra. In Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the United States Supreme Court held that the determination of whether a prospective juror in a capital murder case is properly excluded based on the juror's views concerning the death penalty involves a question of fact. Therefore, a proper review of this determination requires that we give great deference to the trial judge's discretion, because the judge was present and capable of observing the potential jurors and their responses.
"Last Term, in Patton [v. Yount, 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984)], we held that a trial judge's finding that a particular venireman was not biased and therefore was properly seated was a finding of fact .... We noted that the question whether a venireman is biased has traditionally been determined through voir dire culminating in a finding by the trial judge concerning the venireman's state of mind. We also noted that such a finding is based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province. Such determinations were entitled to deference even on direct review ....

"Patton's holding applies equally well to a trial court's determination that a prospective capital sentencing juror was properly excluded for cause....
"... The trial judge is of course applying some kind of legal standard to what he sees and hears, but his predominate function *1026 in determining juror bias involves credibility findings whose basis cannot be easily discerned from an appellate record...."
469 U.S. at 428-29, 105 S.Ct. at 854-55. See also Reynolds v. United States, 98 U.S. 145, 156-57, 25 L.Ed. 244 (1878) ("[T]he manner of the juror while testifying is oftentimes more indicative of the real character of his opinion than his words. That is seen below, but cannot always be spread upon the record. Care should, therefore, be taken in the reviewing court not to reverse the ruling below upon such a question of fact, except in a clear case."). See also Stewart v. State, 405 So.2d 402, 407-08 (Ala.Cr.App.1981), overruled on other grounds, Ex parte Cobb, 703 So.2d 871 (Ala.1996); Nobis v. State, 401 So.2d 191, 198 (Ala.Cr.App.1981), cert. denied, 401 So.2d 204 (Ala.1981).
In the present case, there is no indication that the trial court abused its discretion in determining that these potential jurors should properly be excused for cause based on their views concerning the imposition of the death penalty.

VI.
The appellant argues that the comments made to the jurors during a number of stages of the proceedings "repeatedly and systematically undermined" their sense of the importance of their determination concerning sentencing. Specifically, the appellant refers to the characterization of the jury's determination at the penalty phase of his trial as a "recommendation," which he argues was done without emphasizing that the trial court was required to consider this determination in imposing sentence. The appellant argues that these references by the trial court and prosecutor diminished the jury's sense of responsibility in sentencing, in violation of Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). The record indicates that the appellant failed to object; therefore, this claim must be analyzed pursuant to the plain error rule. Rule 45A, Ala.R.App.P. Although an appellant's failure to object in a case involving the death sentence does not preclude the matter's consideration, it does weigh against his or her claim of prejudice. Kuenzel v. State, 577 So.2d 474 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.1991), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991).
"[T]he condemnation in Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), is that `it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere.' 472 U.S. at 328-29, 105 S.Ct. at 2639. We fully support that principle, yet under Alabama law, the trial judge not the juryis the `sentencer.' `[W]e affirm the principle that, in Alabama, the "judge, and not the jury, is the final sentencing authority in criminal proceedings." Ex parte Hays, 518 So.2d 768, 774 (Ala. 1986); Beck v. State, 396 So.2d [645] at 659 [(Ala.1980)]; Jacobs v. State, 361 So.2d 640, 644 (Ala.1978), cert, denied, 439 U.S. 1122, 99 S.Ct. 1034, 59 L.Ed.2d 83 (1979).' Ex parte Giles, 632 So.2d 577, 583 (Ala. 1993), cert. denied, 512 U.S. 1213, 114 S.Ct. 2694, 129 L.Ed.2d 825 (1994). `The jury's verdict whether to sentence a defendant to death or to life without parole is advisory only.' Bush v. State, 431 So.2d 555, 559 (Ala.Crim.App.1982), aff'd, 431 So.2d 563 (Ala.1983), cert. denied, 464 U.S. 865, 104 S.Ct. 200, 78 L.Ed.2d 175 (1983). See also Sockwell v. State, 675 So.2d 4 (Ala.Cr.App. 1993). `We have previously held that the trial court does not diminish the jury's role or commit error when it states during the jury charge in the penalty phase of a death case that the jury's verdict is a recommendation or an `advisory verdict.' White v. State, 587 So.2d 1218 (Ala.Cr.App.1990), aff'd, 587 So.2d 1236 (Ala.1991), cert. denied, 502 U.S. 1076, 112 S.Ct. 979, 117 L.Ed.2d 142 (1992).' Burton v. State, 651 So.2d 641 (Ala.Cr.App.1993)."
Taylor v. State, 666 So.2d 36, 50-51 (Ala.Cr. App.1994). See also Kuenzel v. State, 577 So.2d at 502 (when a trial court informs a jury that its verdict is advisory or a recommendation and that the trial court makes the final decision concerning sentencing, there is no automatic violation of Caldwell v. Mississippi).
*1027 A review of the comments by the trial court referring to the jury's verdict as a recommendation, in light of the instructions and the trial, taken as a whole, as well as in the context in which they were made, indicates that there is "no reasonable possibility that the jury was misled, misinformed, or confused as to its critical role in sentencing under Alabama law." Taylor v. State, 666 So.2d at 51, citing Martin v. State, 548 So.2d 488, 494 (Ala.Cr.App.1988), aff'd, 548 So.2d 496 (Ala.), cert. denied, 493 U.S. 970, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989).
"`[C]omments which accurately explain the respective functions of the Judge and the jury are permissible under Caldwell "as long as the significance of [the jury's] recommendation is adequately stressed."' Harich v. Wainwright, 813 F.2d 1082, 1101 (11th Cir.1987). Here, neither the prosecutor nor the trial court misrepresented the effect of the jury's sentencing recommendation. The cases of Caldwell, supra. Mann v. Dugger, 817 F.2d 1471 (11th Cir.), vacated, 828 F.2d 1498 (1987); Adams v. Wainwright, 804 F.2d 1526 (11th Cir.1986), modified, Adams v. Dugger, 816 F.2d 1493 (11th Cir.1987); and Harich, supra, each involved a situation where the prosecutor and the trial court misled the jury as to its critical role in sentencing under state law. In Hooks v. State, 534 So.2d 329 (Ala.Cr. App.1987), this Court reviewed the decisions of other jurisdictions which have confronted this issue and concluded: `The trial judge's and the prosecutor's remarks clearly defined the jury's role in the sentencing scheme. Thus, the jury could not have been confused as to its responsibility in the sentencing process. The remarks made here were a correct statement of the law and did not tend to mislead or misinform the jury. Therefore, we conclude the remarks were not improper under Caldwell, supra.'"
Martin v. State, supra, at 494.
In the present case, there was no impropriety in the trial court's reference to the jury that its sentencing verdict was a recommendation.

VII.
The appellant argues that this case is due to be reversed because of the prosecutor's alleged "pervasive misconduct" during his closing argument, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and in violation of Alabama law. Specifically, the appellant refers to a number of comments made by the prosecutor in his arguments to the jury during his closing and rebuttal arguments at the guilt phase, which the appellant argues individually and collectively denied him the right to a fair trial. The arguments cited by the appellant as improper will be addressed categorically; however, it should be noted that the appellant failed to object at trial to any of these arguments. Rule 45A, Ala.R.App.P. While it does not preclude his right to present these issues on appeal, his failure to object at trial weighs against a finding of prejudice. Kuenzel v. State, supra.

A.

Improper Exhortation to Convict
During his closing argument, the prosecutor made the following comments to the jury:
"Now, the Sheriff's Department and the his people and the detectives in Chattanooga, the friends in Chattanooga, all these people have come here to testify. They have gathered all the evidence that they know about in this case. And we've done our best to trace it all the way through and bring it into the courtroom for your consideration. But, of course, the jury has the authority to decide this case, whether Chris Price is guilty or innocent. Whatever the police officers have done, whatever the detectives have done, whatever all these witnesses have done, whatever the laboratory people have done, is without any result unless the jury will seriously consider these facts and this evidence."
The appellant argues that these comments served to pressure the jury to convict the appellant because of the prosecutor's exhortations that all of the prosecution personnel had put a great deal of work into obtaining this conviction; thus, the inference to be drawn was that it was the jury's duty *1028 to convict the appellant and that justice could be done only by returning a conviction. The appellant cites Arthur v. State, 575 So.2d 1165, 1185 (Ala.Cr.App.1990), cert. denied, 575 So.2d 1191 (Ala.1991), in support of his argument. However, this case is distinguishable from Arthur. In Arthur the prosecutor erroneously argued to the jury that it could do its job only by convicting the appellant, "regardless of its duty to weigh the evidence and to follow the court's instructions on the law."[3] In the present case, however, the prosecutor clearly stated that the work done by the prosecution would be "without any result unless the jury will seriously consider the facts and this evidence." Thus, the prosecutor did not argue that the jury should convict the appellant, despite the evidence and law. Rather, his argument was that, a consideration of the facts and evidence presented by the prosecution should persuade the jury that a prima facie case had been presented to support a conviction.
"`"Certainly the State's attorney should be permitted to comment on the character of the evidence presented by the State and its strength. That certain evidence is uncontradicted tends to show its strength. Our statute does not abrogate the right of the State's counsel to comment on legitimate inferences in this regard."'" Taylor v. State, 279 Ala. 390, 391, 185 So.2d 414, 415, (1966), quoting Welch v. State, 263 Ala. 57, 81 So.2d 901 (1955). "A prosecutor has the latitude to comment on the fact that the State's evidence is uncontradicted or has not been denied." Ex parte Williams, 461 So.2d 852, 853 (Ala.1984), citing Beecher v. State, 294 Ala. 674, 320 So.2d 727, 734 (1975).
In Hunt v. State, 659 So.2d 933 (Ala.Cr. App.1994), aff'd, 659 So.2d 960 (Ala.1995), cert. denied, 516 U.S. 880, 116 S.Ct. 215, 133 L.Ed.2d 146 (1995), Hunt objected to a number of arguments made to the jury by the prosecutor, including one wherein the prosecutor stated that the State did not intend to ask the jury to convict the appellant on "flimsy evidence," because the evidence presented was "overwhelming," and that "at the conclusion of this trial that you will agree with the State of Alabama that the defendant is guilty of capital murder." Id. at 940-41. Hunt also complained that the prosecutor argued to the jury that the evidence as to the defendant's guilt was overwhelming and that Hunt's guilt had been proven beyond a reasonable doubt, and stated that "if this isn't capital murder, then there has never been capital murder in Walker County." This Court found no error in the prosecutor's arguments to the jury, stating:
"`"[T]he rule on which the weight of authority is in agreement is that it is improper for the prosecuting attorney so as to express his personal opinion or belief in guilt of accused as to permit an inference by the jury that such opinion or belief is based on reasons or information outside the evidence, but that it is not improper for him to argue or to express his opinion that accused is guilty, where he states, or it is apparent, that such opinion, is based solely on the evidence." 23A C.J.S. Criminal Law § 1104, p. 194-95 (1961). See Crenshaw v. State, 153 Ala. 5, 7, 45 So. 631, 632 (1908) (prosecutor argued to the effect that the evidence showed a clear case); Cranmore v. State, 41 Ala.App. 276, 279, 129 So.2d 121, 123 (1961) (prosecutor's statement, "I never did ask you to convict a man I believe to be innocent" found to be "a mere expression of opinion by the solicitor that the defendant was guilty, and ... not a cause for reversal"); Handley v. State, 214 Ala. 172, 175, 106 So. 692, 695 (1925) (argument, "She is a murderer; she is a murderer. She is not someone who has committed some of the lower offenses of homicide" did "not transcend the bounds of legitimate argument"); Gardner v. State, 17 Ala.App. 589, 590-91, 87 So. 885, 886, cert. denied, 205 Ala. 60, 87 So. 888 (1920) (prosecutor's argument that the *1029 defendant "is a pickpocket" in prosecution for grand larceny "was the expression of an opinion" by the prosecutor, "and from the state's contention was supported by one phase of the evidence." Presiding Judge Bricken dissented, arguing that "it did not lie in the mouth of the solicitor to decide these vital questions"); McColston v. State, 20 Ala.App. 591, 593, 104 So. 347, 348-49 (1925) (prosecutor's argument, "He is guilty of the crime of highway robbery," should be refrained from but did not constitute error); Dunn v. State, 19 Ala.App. 576, 577, 99 So. 154, 155 (1924) (prosecutor's comment, "I tell you that this defendant is guilty," was merely an argument of the inference drawn by the solicitor and was not improper); Griggs v. State, 21 Ala.App. 530, 531, 109 So. 611 (1926) (prosecutor stated that from the evidence he believed the defendant was guilty, and that, if he did not believe the defendant was guilty, he would not ask the jury to convict him. Held: The opinion was based upon the evidence. "Where this is the case, such expression of opinion will not be sufficient upon which to predicate a reversal."); Tucker v. State, 28 Ala.App. 492, 494, 188 So. 276, 277 (1939) (prosecutor's statement, "I believe he [defendant] is guilty" was a "mere expression of opinion by the solicitor" and not improper remark); Gilbert v. State, 19 Ala.App. 104, 106-07, 95 So. 502, 504 (1923) (prosecutor's closing argument, "He is guilty as hell itself under this testimony, and you know it" though not approved was "but the mere expression of counsel made in argument").'

"Galloway v. State, 484 So.2d 1199, 1201 (Ala.Cr.App.1986)."
Hunt v. State, supra, at 941-42.
In the present case, there is no error in this argument by the prosecutor, which concerned the strength of the State's case and implored the jurors to consider the acts and evidence presented.

B.

Vouching for a Witness's Credibility
The appellant argues that the prosecutor improperly vouched for the credibility of State's witness Micah Donaldson, the appellant's friend in Chattanooga with whom he stayed following the offense and in whose home he was eventually apprehended. Donaldson testified that the appellant told him that he had murdered Bill Lynn and that he planned to deny having killed Lynn. The prosecutor, in his rebuttal argument at the guilt phase, commented on this evidence, stating:
"All right. What about some other evidence, testimony to identify who that person was? What was said from the witness stand? When you listen and look at the evidence that applies, you remember to take into account who has a self interest in this thing. Who is going to say something to cover themselves up? He told Micah Donaldson in Chattanooga, `I did it. It's true.' That's the words he said. `It's true. I did it.' I killed the man. That's exactly what I said. It wasn't the police. Micah Donaldson, there wasn't any reason in the world for him to lie about that, none. He has no interest in this whatsoever."
The appellant argues that this error was further compounded by the prosecutor's statement previously made in his closing argument at the guilt phase, which was as follows:
"The other statement that you have before you was an admission he made to his friend Micah Donaldson in Chattanooga. He had told Micah that he was the one really that did stab him. And of course that's a true statement under the evidence. That's the really true statement. He did this stabbing and he admitted to his friend. Not only that, but he told Micah Donaldson he was going to lie about it. That's exactly what he did later to the detective about his part in this murder."
There was no impropriety by the prosecutor in making these comments because they were grounded in the evidence and were proper inferences from the evidence; moreover, the credibility of witnesses is proper subject matter for arguments to the jury. In Cross v. State, 536 So.2d 155 *1030 (Ala.Cr.App.1988), the district attorney, in closing argument to the jury, stated that the defendant's son had lied and that a deputy sheriff had told the truth, further commenting that the deputy sheriff had no reason to lie. This Court noted that the testimonies of defense witnesses and the deputy sheriff, who was a State's witness, were in conflict and were properly opened to comment during closing argument. This Court stated:
"[T]he testimony was in evidence and the prosecutor could comment on this, since her comments were supported by the evidence. Moreover, the credibility of a witness is a legitimate subject of comment during closing arguments. In Milton v. State, 417 So.2d 620 (Ala.Cr.App.1982), the prosecution called the appellant's witness a `blatant liar'; we held that the prosecutor's argument or comment was within the scope and limit of argument, because the argument went to the credibility of the witness. 417 So.2d at 623. In Clark v. State, 462 So.2d 743, 747 (Ala.Cr.App. 1984), we held that when a party places a witness on the stand, he vouches for his credibility, but does not personally vouch for the witness. In the case at bar, the prosecutor was arguing to the jury as to the effect of the witness's testimony, but was not personally vouching for [the witness's] credibility.
"Therefore, the trial court did not err in allowing the prosecution to attack the credibility of the appellant's witness, nor did the prosecutor personally vouch for the credibility of the State's witness."
536 So.2d at 159-60. See also Ex parte Rieber, 663 So.2d 999 (Ala.1995), cert.denied, 516 U.S. 995, 116 S.Ct. 531, 133 L.Ed.2d 437 (1995).
Similarly, in DeBruce v. State, 651 So.2d 599 (Ala.Cr.App.1993), aff'd, 651 So.2d 624 (Ala.1994), the prosecutor argued to the jury that a State's witness was telling the truth and that the robbery/murder occurred just as the witness had testified. The prosecutor further argued that a defense witness was not telling the truth, but had presented "a baldfaced lie." Id. at 610. This Court found no impropriety by the prosecutor's comments, stating:
"A distinction must be made between an argument by the prosecutor personally vouching for a witness, thereby bolstering the credibility of the witness, and an argument concerning the credibility of a witness based upon the testimony presented at trial. `[P]rosecutors must avoid making personal guarantees as to the credibility of the state's witnesses.' Ex parte Parker, 610 So.2d 1181 (Ala.1992). See Ex parte Waldrop, 459 So.2d 959, 961 (Ala.1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2050, 85 L.Ed.2d 323 (1985).
"`"Attempts to bolster a witness by vouching for his credibility are normally improper and error."... The test for improper vouching is whether the jury could reasonably believe that the prosecutor was indicating a personal belief in the witness' credibility.... This test may be satisfied in two ways. First, the prosecution may place the prestige of the government behind the witness, by making explicit personal assurances of the witness' veracity.... Secondly, a prosecutor may implicitly vouch for the witness' veracity by indicating that information not presented to the jury supports the testimony.'

"United States v. Sims, 719 F.2d 375, 377 (11th Cir.1983), cert. denied, 465 U.S. 1034, 104 S.Ct. 1304, 79 L.Ed.2d 703 (1984).
"Here, the district attorney did not give any personal assurance of McCant's veracity and did not imply that he had information that had not been presented to the jury that supported McCant's testimony. `The credibility of a witness is a legitimate subject of criticism and discussion.' Flint v. State, 370 So.2d 332, 335 (Ala.Cr.App. 1979). Here, as in Smith v. State, 344 So.2d 1239, 1242 (Ala.Cr.App.), cert. denied, 344 So.2d 1243 (Ala.1977), `[t]he prosecutor's remarks were grounded on some testimony given by the witness himself.' See also Watson v. State, 398 So.2d 320, 328 (Ala.Cr.App.1980), cert. denied, 398 So.2d 332 (Ala.), cert. denied, 452 U.S. 941, 101 S.Ct. 3085, 69 L.Ed.2d 955 (1981) (reference in closing argument to defendant as a `bald face liar' was `a hard blow but it was not foul')." *1031 DeBruce v. State, 651 So.2d at 610-611. See also Hunt v. State, supra, at 942-943.
In the present case, there was no impropriety in the prosecutor commenting on an inference from the evidence that the witness's statements were credible.

C.

Injection of Prosecutor's Own Views
The appellant argues that the prosecutor wrongfully injected his own views into the jury's determination by making the following argument:
"I tell myself, you know, this is easy, you know, an easy case. You have an eyewitness. You have a confession. You have all this evidence. Billy Law and Butch and the sheriff and all of them found it exactly where he said it was, right out there, all of it. The pistol, Barry Corkeren went right to it. You know, locked case."
However, this comment did not constitute plain error.
"`The remark of the State's attorney was no more than a comment that a certain phase of the State's evidence was uncontradicted. Certainly, the State's attorney should be permitted to comment on the character of the evidence presented by the State and its strength. That certain evidence is uncontradicted tends to show its strength. Our statute does not abrogate the right of the State' counsel to comment on legitimate inferences in this regard.'"
Welch v. State, 263 Ala. 57, 58, 81 So.2d 901, 902 (1955), quoting Littlefield v. State, 36 Ala.App. 507, 512-13, 63 So.2d 565, 570, cert. denied, 258 Ala. 532, 63 So.2d 573 (1952). See also Taylor v. State, 279 Ala. 390, 185 So.2d 414 (1966); George v. State, 54 Ala. App. 90, 92, 304 So.2d 908 (1974).
The prosecutor had a right to comment on the strength of the evidence the State had presented and to draw any reasonable inferences from it. There was no impropriety in these comments.

D.

Inflammatory Arguments
The appellant argues that the prosecutor made several statements that had a basis in emotions rather than in facts or inferences taken from the evidence and that, therefore, affected the reliability of the jury's verdict. The appellant cites the following argument made by the prosecutor to the jury.
"You know what's hard about this case? It's to make y'all realize that this really happened. This ain't a T.V. show. This is not a book. It's not a movie. Bazemore, not New York City. Ten or so miles, as the crow flies, from here. It happened. That's why we show you these pictures, not to shock you or anything like that, but to let you know this happened. It's real. I got to make you face the horror of this thing to realize what happened. That's the hardest part."
However, a review of the evidence presented at trial concerning the facts and circumstances of the present offenses indicates that the prosecutor was drawing reasonable inferences from the evidence by calling what transpired a "horror."
"`The prosecutor's comment was a reasonable inference from the evidence. "The test of a legitimate argument is that whatever is based on facts in evidence is within the scope of proper comment and argument to the jury." Ward v. State, 440 So.2d 1227, 1230 (Ala.Cr.App.1983). "Counsel for both the State and [the] defendant are allowed wide latitude in drawing reasonable inferences from the evidence in their closing arguments. A prosecutor as well as defense counsel has a right to present [her] impression from the evidence, if reasonable, and may argue every legitimate inference." Manigan v. State, 402 So.2d 1063, 1072 (Ala.Cr. App.), citations omitted, cert. denied, 402 So.2d 1072 (Ala.1981). "A prosecutor may express her opinion concerning reasonable inferences, deductions, and conclusions to be drawn from the facts and evidence, as long as she does not express an opinion as to the defendant's guilt. Sams v. State, 506 So.2d 1027, 1029 (Ala.Cr.App. *1032 1986)." Cross v. State, 536 So.2d 155, 160 (Ala.Cr.App.1988).'"
Wilkerson v. State, 686 So.2d 1266 (Ala.Cr. App.1996), quoting Wright v. State, 641 So.2d 1274, 1282 (Ala.Cr.App.1993). See also Arthur v. State, supra (prosecutor's comment that the appellant had a "big ego" and was a manipulator of people was a reasonable inference from the facts in evidence;) Taylor v. State, 666 So.2d 36, 65 (Ala.Cr.App.1994) (prosecutor's characterizations of the crime as a "massacre" and the crime scene as a "slaughterhouse" were not improper under the facts of the case).

E.

Prosecutor's Attempt to Pull the Jurors into a Prosecutorial Role
The appellant argues that the prosecutor sought to make the jurors identify with the State's position by using the term "we" to refer to both the prosecution and the jury as a single group, as well as by certain other of his comments. The appellant refers to the following portion of the prosecutor's closing argument to the jury during the guilt phase:
"I told you at the outset that you would be the sole and exclusive judges of the facts of this case, that it would be up to you to look to the evidence with a view of determining what the true facts are. I'm not going to belabor it, but I do have to remind you of certain facts. You're the sole and exclusive judges of the facts. It's not my role in the case and it's not up to me to decide whether or not the State has proved the charges in this case. That's entirely up to you.
"Now, what is this evidence that's been before you? First, various witnesses have testified. Some of them were lay witnesses; that is, they are just people who come in and testify about the things that they have seen, heard, felt and so forth. Then there are some that we will call expert witnesses. An expert is simply one who, because of their eduction, training or experience, has attained some skill or knowledge or experience of some science, profession, business or occupation which is not of common knowledge to the average lay person.
"Now, whether a witness is an expert or whether a witness is a lay witness, if a witness, during the trial of the case, during the time they are testifying up here sitting on the stand if they testify and during their testimony they express an opinion, draw a conclusion, the jury is not required to accept the conclusions or expressed opinions of those witnesses, but rather, the jury must determine for yourselves the weight to be given to that testimony and evidence when considered in connection with all of the evidence in the case.
"I told you at the outset that you are the sole and exclusive judges of the evidence. You are likewise the exclusive judges of the weight of the evidence, its believability, its credibility, what weight you will accord to that evidence.
"When you take your place in the jury box, you do not have to blindly accept anything and everything that comes before you. You have the right to weigh the evidence and in weighing that evidence you have the right to consider anything which you in your everyday affairs would consider in passing upon the truthfulness and the accuracy of statements made to you. For instance, when witnesses testify before you, those witnesses present themselves in front of you. You have the right to observe their demeanor; that is, how they appear while they testify. Thus, you may consider whether they testified frankly and straightforwardly or did they testify evasively. Were they testifying about facts which were within their knowledge or were they guessing.
"You may consider those things which you in your every-day affairs would consider in passing upon the accuracy of statement made to you. You also have the right to consider any item of impeachment that is against the witness; for instance, whether or not a witness might be biased, if a witness is sympathetic to one side or prejudiced against another side, if they are connected with a party in the case, if they are kin to someone, if they're friends with someone or if they're enemies of someone. You as a jury have right to consider those types of things in passing upon the witness' *1033 testimony because in that instance it would be human nature that they might be more favorable to one side or prejudiced against the other side, if there is evidence of ill feelings or friendship or kinship, or if they're connected by their stations in life or something of that nature.
"Any connection that they might have to one side or the other can be considered in determining whether or not the witness might be biased in favor of one side or against the other side.
"You should attempt in every way that you can to reconcile all of the testimony in this case so that, if possible, to make all the witnesses speak the truth. But if you cannot do that and you find that the evidence is in conflict on material points, then it's up to you to decide what are the true facts. In other words, you must weigh the evidence and decide what is believable and what is not believable, but in passing upon the evidence, you cannot capriciously disregard the testimony of a single witness. You should look at all of the evidence in the case with a view of determining what the true facts are and then make your decision from the evidence. If you find that some of the evidence is unworthy of belief, then you have the right not to consider that evidence, but you first start out with all of the evidence with a view of determining what the true facts are and then sort through out, always remembering that your job is to determine the truth."
There is no impropriety in a prosecutor's appeal to the jury for justice and to properly perform its duty. "`We view the comments as a call for justice, not sympathy, and, thus, conclude that they are within the latitude allowed prosecutors in their exhortation to the jury to discharge its duty.' Ex parte Waldrop, 459 So.2d 959 (Ala.1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2050, 85 L.Ed.2d 323 (1985); Rutledge v. State." Gentry v. State, 689 So.2d 894, 906 (Ala.Cr. App.1994), reversed on other grounds, 689 So.2d 916 (Ala.1996).
"The fact that an argument has emotional overtones does not independently indict it as improper, and the propriety of argument rests primarily in the relation of its content to issues relevant to the sentencing jury's concern. Brooks v. Kemp [762 F.2d 1383 (11th Cir.1985), cert. denied, 478 U.S. 1022, 106 S.Ct. 3337, 92 L.Ed.2d 742 (1986)]. We view the above arguments as being a general appeal for law enforcement and justice, and an appeal to the jury to discharge its duties in such a manner as to punish for the commission of crime and to deter others from committing like offenses. Ex parte Waldrop [459 So.2d 959 (Ala. 1984)]. The arguments were directed to a relevant sentencing concern of the jury, they were not delivered in an excessive and intolerable manner, and they did not divert the jury's attention from its proper function. Brooks v. Kemp."

Rutledge v. State, 523 So.2d 1087, 1101 (Ala. Cr.App.1987), reversed on other grounds, 523 So.2d 1118 (Ala.1988). There was no impropriety by the prosecutor in his appeal to the jury for justice, even if this appeal had emotional overtones.

F.

Improper Allusion to Suffering of Victim's Family
The appellant argues that the prosecutor, in his rebuttal argument, improperly commented on the suffering of Bill Lynn's family members, specifically, his grandson. The record indicates that as a final comment of his rebuttal argument, the prosecutor posed the rhetorical question, "Who finished putting that tricycle together?" The appellant argues that this comment heightened the risk that the jury would render a biased, passion-driven, and unreliable verdict. The appellant argues that by drawing attention to the suffering the victim's family members, the prosecutor may have caused the jury to impose the death penalty based on irrelevant and prejudicial references.
The record indicates that this comment was made by the prosecutor in his rebuttal argument at the close of the guilt phase, rather than at sentencing. However, a review of the entire argument indicates that this comment was based on the facts in evidence as to what occurred on the night of the *1034 offense, and referred only to the loss of the victim and the importance of this case to his family. In Slaton v. State, supra, the defendant challenged similar comments by the district attorney made at the opening and closing of the guilt phase, arguing that Booth v. Maryland, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), and South Carolina v. Gathers, 490 U.S. 805, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989), still applied to such comments made during the guilt phase, because they were irrelevant and highly prejudicial. However, this Court found no error in those comments, stating that they "merely thanked the jury for its service on behalf of the family, and pointed out the importance of this case to the family. This Court has held that there is nothing wrong with introducing family members to the jury, nor is it reversible error when the prosecutor briefly suggests that he is speaking on behalf of the victim's family." Slaton v. State, 680 So.2d 879, 906 (Ala.Cr.App.1995), citing Henderson v. State, 583 So.2d 276, 286 (Ala.Cr.App. 1990), affirmed, 583 So.2d 305 (Ala.1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992).
Moreover, these comments, which were made during the guilt phase did not result in error as to sentencing. In Payne v. Tennessee, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), the United States Supreme Court determined that victim impact evidence was admissible for consideration by the jury during the sentencing phase of a capital case. "[A] prosecutor may present and argue evidence relating to the victim and the impact of the victim's death on the victim's family in the penalty phase of a capital trial." McNair v. State, 653 So.2d 320, 331 (Ala.Cr.App.1992). The United States Supreme Court's holding in Payne v. Tennessee, "was based in large measure on the premise that this type of evidence related to the harm done by the defendant and, consequently, was a valid consideration in determining punishment to be imposed." Id. Moreover, "even before Payne, this Court had indicated that `Booth and Gathers pertain only to evidence or argument presented at the sentence phase of a capital trial... and have no bearing on ... remarks [made at the guilt phase].'" 653 So.2d at 331, quoting Henderson v. State, 583 So.2d 276, 287 (Ala.Cr.App.1990), affirmed, 583 So.2d 305 (Ala.1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992) (emphasis added); Pierce v. State, 576 So.2d 236, 251 (Ala.Cr.App.1990), cert. denied, 576 So.2d 258 (Ala.1991); Williams v. State, 601 So.2d 1062 (Ala.Cr.App.1991), aff'd, 662 So.2d 929 (Ala. 1992), cert. denied, 506 U.S. 957, 113 S.Ct. 417, 121 L.Ed.2d 340 (1992).
In the present case, the evidence to which the prosecutor alludedthe fact that the victim was in the course of assembling a tricycle for his grandson when he was killedwas part of the res gestae of the offense. The facts in evidence established that these were the victim's actions immediately prior to the fatal attack upon him.
"The District Attorney's argument in this case, though flamboyant, did not venture outside the circumstances of the offense to inflame the jury with irrelevant emotional considerations. At worst, it over-dramatized a relevant piece of evidence whose emotional content was already obvious and whose capacity to elicit an emotional response could not have been eliminated from the case."
McNair v. State, supra, at 336.

VIII.
The appellant argues that the trial court misapplied the capital sentencing scheme and thereby deprived him of his rights to due process and to a reliable sentencing determination. Specifically, the appellant argues that the trial court's failure to find the "relatively minor participation" statutory mitigating circumstance and his finding of the especially "heinous, atrocious, or cruel" aggravating circumstance resulted from a misinterpretation of the facts in evidence and a misapplication of the relevant legal standards.

A.
The appellant argues that the trial court improperly found the existence of the aggravating circumstance that the offense was "especially heinous, atrocious, or cruel" when compared to other capital offenses because, *1035 he says, the evidence did not support this finding. He argues that the evidence indicated that the attack on Bill Lynn was over a relatively short period of time and did not involve any physical or psychological torture. He further argues that it did not affect any "especially vulnerable persons such as children or the infirmed." Thus, the appellant argues that this murder against "a single, adult male individual" did not meet the standard required to distinguish this case from the general capital murder case, citing Godfrey v. Georgia, 446 U.S. 420, 433, 100 S.Ct. 1759, 1767, 64 L.Ed.2d 398 (1980).
However, a review of the record clearly indicates that the victim suffered horrible physical and psychological torture. The autopsy indicated that he suffered a total of 39 cuts, lacerations, and stab wounds, indicating that he was repeatedly stabbed and cut with a knife and/or sword. Moreover, the victim survived the initial attack and was able to converse with his spouse, telling her that he knew he was going to die. He also apparently witnessed the attack on her or the results of that attack. Moreover, the dramatic staging of the offense, by cutting the telephone lines and the electrical wires and dressing in black, hooded clothing, added to the atmosphere of this murder. This evidence clearly established that the present offense was "especially heinous, atrocious, or cruel." Bankhead v. State, 585 So.2d 97, 111 (Ala.Cr.App. 1989), remanded on other grounds, 585 So.2d 112 (Ala.1991).

B.
The appellant argues that the State failed to disprove by a preponderance of the evidence the existence of the mitigating circumstance that his participation in the capital murder was "relatively minor;" therefore, he says, the trial court erred in failing to find the existence of this mitigating circumstance. See § 13A-5-51(4) Code of Alabama 1975. However, a review of the evidence clearly indicates that the appellant's participation in this offense was not relatively minor. The trial court made the following findings as to this matter:
"The evidence was that the defendant participated in every phase of the crime. The gloves, mask, and weapons that were used belonged to him and he drove the vehicle that was used. In his confession he tried to minimize his participation but he told his friend in Tennessee that he had committed a murder in Alabama. He helped to dispose of the weapons that were used in the crime and also spent some of the money that was stolen. The evidence proves beyond a reasonable doubt that the defendant was more than a minor actor in the robbery and the murder of Bill Lynn."
This finding by the trial court properly indicated that he considered the evidence presented in arriving at his determination that the mitigating circumstance did not exist. Although the appellant argues that the evidence was in conflict, this determination is factual and rests within the sound discretion of the trial judge.
"[T]he trial judge carefully articulated the reasons why he found that those mitigating factors were not present in this case. The written order of the trial judge demonstrates that the trial judge considered all of the evidence offered to establish these statutory mitigating circumstances and then rejected that evidence as not only insufficient, but as `disproven' by other evidence. The factual determination of the existence or nonexistence of a mitigating circumstance is within the sound discretion of the trial judge where the evidence in that regard is in conflict. See Ex parte Jones, 520 So.2d 553, 555 (Ala.), cert. denied, 488 U.S. 871, 109 S.Ct. 182, 102 L.Ed.2d 151 (1988) (`[a]lthough ... a victim to the crime ... testified that he thought Jones was intoxicated and that he heard Arthur Giles tell Jones what to do, we find that it was not improper for the trial court to conclude that these did not constitute mitigating factors under the circumstances'). See also Puiatti v. State, 495 So.2d 128, 132 (Fla.1986) (`the trial court considered the mitigating factors ... but concluded they failed to rise to a sufficient level to be weighed as mitigating circumstances'). Cf. Ex parte Cochran, 500 So.2d 1179, 1187 (Ala.1985), cert. denied, 481 U.S. 1033, 107 S.Ct. 1965, 95 L.Ed.2d 537 (1987) (`[t]he trial judge's order *1036 does not state whether he considered the evidence offered by defendant and then determined that it was insufficient or whether he merely precluded it without consideration'); Clisby v. State, 456 So.2d 99, 102 (Ala.Cr.App.), affirmed after remand, 456 So.2d 102 (Ala.Cr.App.1983); affirmed, 456 So.2d 105 (Ala.1984); cert. denied, 470 U.S. 1009, 105 S.Ct. 1372, 84 L.Ed.2d 391 (1985) (`[f]rom the trial judge's written findings, we cannot determine whether he considered the defendant's mental deficiency as a mitigating circumstance and then determined that the degree of mental disability was simply insufficient to support those mitigating circumstances defined in Section 13-11-7(2) and (6), or whether he merely decided that the defendant's mental disability could not be considered as a mitigating circumstance as a matter of law because it did not measure up to the statutory standard')."
Wesley v. State, 575 So.2d 108, 121 (Ala.Cr. App.1989), reversed on other grounds, 575 So.2d 127 (Ala.1990).

IX.

A.
The appellant argues that the trial court's charge on evaluating the credibility of witnesses erroneously created a presumption that witnesses were truthful, thereby diluting the State's burden of proof. The appellant cites the following charge as erroneous on this ground:
"You should attempt in every way that you can to reconcile all of the testimony in this case so that, if possible, to make all the witnesses speak the truth. But if you cannot do that and you find that the evidence is in conflict on material points, then it's up to you to decide what are the true facts. In other words, you must weigh the evidence and decide what is believable and what is not believable, but in passing upon the evidence, you cannot capriciously disregard the testimony of a single witness. You should look at all of the evidence in the case with a view of determining what the true facts are and then make your decision from the evidence. If you find that some of the evidence is unworthy of belief, then you have the right not to consider that evidence, but you first start out with all of the evidence with a view of determining what the true facts are and then sort through it, always remembering that your job is to determine the truth."
The appellant argues that this charge violates the rule of evidence in Alabama that "there is no presumption that a witness is telling the truth." Williams v. State, 520 So.2d 179, 181 (Ala.Cr.App.1987). He further argues that the trial court's instructions to the jury that it should seek to reconcile the testimony of the witnesses suggests that the jury should initially take this testimony as true and thereby effectively charges the jury to believe all of the State's witnesses. He also argues that the latter part of this charge encourages the jury to sort the good testimony from the bad but gave no guidelines for applying the reasonable doubt standard.
The record indicates that the appellant failed to object to this instruction at trial; therefore, this matter must be analyzed pursuant to the plain error rule, Rule 45A, Ala. R.App.P.
The trial court's instructions to the jury that it should attempt to reconcile all of the testimony, if possible, in order to make the witnesses speak the truth, neither invaded the jury's exclusive right to determine credibility of witnesses nor raised a presumption that all witnesses testified truthfully. In light of the entire charge, there was no plain error resulting from this isolated statement. Ex parte Musgrove, 638 So.2d 1360 (Ala. 1993), cert. denied, 513 U.S. 845, 115 S.Ct. 136, 130 L.Ed.2d 78 (1994).
In the present case, the trial court gave the following entire charge to the jury concerning its role as the trier of fact in examining the credibility of witness testimony:
"Now, whether a witness is an expert or whether a witness is a lay witness, if a witness, during the trial of the case, during the time they are testifying up here sitting on the stand, if they testify and during their testimony they express an opinion, draw a conclusion, the jury is not required *1037 to accept the conclusions or expressed opinions of those witnesses, but rather, the jury must determine for yourselves the weight to be given to that testimony and evidence when considered in connection with all of the evidence in the case.
"I told you at the outset that you are the sole and exclusive judges of the evidence. You are likewise the exclusive judges of the weight of the evidence, its believability, its credibility, what weight you will accord that evidence.
"When you take your place in the jury box, you do not have to blindly accept anything and everything that comes before you. You have the right to weigh the evidence and in weighing that evidence you have the right to consider anything which you in your everyday affairs would consider in passing upon the truthfulness and the accuracy of statements made to you. For instance, when witnesses testify before you, those witnesses present themselves in front of you. You have the right to observe their demeanor; that is, how they appear while they testify. Thus, you may consider whether they testified frankly and straightforwardly or did they testify evasively. Were they testifying about facts which were within their knowledge or were they guessing?
"You may consider those things which you in your everyday affairs would consider in passing upon the accuracy of statements made to you. You also have the right to consider any item of impeachment that is against the witness; for instance, whether or not a witness might be biased, if a witness is sympathetic to one side or prejudiced against another side, if they are connected with a party in the case, if they are kin to someone, if they're friends with someone or if they're enemies of someone. You, as a jury, have a right to consider those types of things in passing upon the witness's testimony because in that instance it would be human nature that they might be more favorable to one side or prejudiced against the other side, if there is evidence of ill feelings or friendship or kinship, or if they're connected by their stations in life or something of that nature.
"Any connection that they might have to one side or the other can be considered in determining whether or not the witness might be biased in favor of one side or against the other side."
"You should attempt in every way that you can to reconcile all of the testimony in this case so that, if possible, to make all the witnesses speak the truth. But if you cannot do that and you find that the evidence is in conflict on material points, then it's up to you to decide what are the true facts. In other words, you must weigh the evidence and decide what is believable and what is not believable, but in passing upon the evidence, you cannot capriciously disregard the testimony of a single witness. You should look at all of the evidence in the case with a view of determining what the true facts are and then make your decision from the evidence. If you find that some of the evidence is unworthy of belief, then you have the right not to consider that evidence, but you first start out with all of the evidence with a view of determining what the true facts are and then sort through it, always remembering that your job is to determine the truth."
Even if a particular statement in an instruction may be misleading, confusing, or erroneous, it does not rise to the level of plain error if the instruction, when reviewed completely, properly presents the law. Williams v. State, 538 So.2d 1250, 1253 (Ala.Cr.App. 1988). There was no plain error in these instructions.

B.
The appellant argues that the trial court diluted the State's burden of proof by instructing the jurors to sort the bad testimony from the good testimony, without providing any guidelines as to the reasonable doubt standard. The cited instruction by the trial court informed the jury that it should determine the credibility of the evidence. This is one of the required tasks of examination by a jury in determining whether the evidence presented by the State has proved that the defendant is guilty beyond a reasonable doubt. This was a proper charge by the trial court and was not plain error.

*1038 X.
The appellant argues that the trial court's instructions defining robbery as an underlying offense to a capital murder charge was broader than the definition set forth in the indictment, thereby violating his rights to due process and a fair trial. He further argues that by "broadening the charge," by adding an alternative theory for the robbery element of capital murder, the trial court also created a risk of a nonunanimous verdict.
The record indicates that the appellant was originally charged in four indictments; two of which were dismissed upon the motion of the State. The appellant was then charged with the two remaining indictments, both containing two counts. The first indictment charged the appellant with intentional murder committed during the course of a robbery in the first degree, a violation of § 13A-5-40(a)(2), Code of Alabama 1975, both counts alleging that the appellant had killed the victim by cutting and stabbing with a sword or knife in the course of committing a theft of jewelry and money belonging to the victim, Bessie Lynn. The first count alleged the use of force against both victims while the appellant was armed with a deadly weapon or dangerous instrument, specifically a sword or knife. The second count alleged the use of force against the person of Bill Lynn, while the appellant was armed with a deadly weapon or instrument, specifically a sword or knife. The appellant was also charged in a second indictment with robbery in the first degree. The first count charged that, in committing a theft of jewelry, money, and a bank deposit bag, he used or threatened force against Bessie Lynn with the intent to overcome her physical resistance while he was armed with a deadly weapon or dangerous instrument, specifically a sword or knife. The other count charged that, in the course of committing a theft of the same property, the appellant used force against Bill Lynn in order to take or escape with the property, while the appellant was armed with a deadly weapon or dangerous instrument, specifically a sword or knife.
The first count of the capital murder indictment and the second count of the first degree robbery indictment were subsequently dismissed upon motion of the State.
The record indicates that the trial court charged the jury, as to robbery in the first degree as an element of capital murder and again as a separate charge, that the State must prove that the appellant caused serious physical injury or death to another person in committing, or attempting to commit, a theft and, in doing so, was armed with a deadly weapon. The appellant argues that because he was indicted for committing robbery in the first degree by having been armed with a deadly weapon or dangerous instrument, the trial court improperly charged the jury as to the alternate method of proving robbery in the first degree, i.e., by causing serious physical injury or death to another person.
In his brief on appeal, the appellant acknowledges that this Court has previously rejected a claim that a variance existed between the indictment and the proof where the alternate methods of proving robbery in the first degree were charged and proved; however, the appellant argues that, because that case did not involve the death penalty, it should not be applicable to the present case. Hamilton v. State, 455 So.2d 170 (Ala.Cr. App.1984). In Hamilton v. State, supra, the jury charge included language from § 13A-8-41(a)(1) and (2), Code of Alabama 1975, while the indictment included only the language of § 13A-8-41(a)(1), Code of Alabama 1975. Thus, the alleged variance was identical to the present case. In that case, this Court held that this alleged variance was not material because the allegations in the indictment and the proof at trial substantially corresponded, and the defendant could not have been misled at trial. Id., at 172-73. This Court distinguished a situation, such as is found in the present case, where the jury is charged on both subsections of robbery in the first degree from other situations in which the jury is charged on an uncharged subsection. E.g., Ex parte Hightower, 443 So.2d 1272 (Ala.1983) (charging sexual intercourse without consent for offense of rape, but proving that the defendant obtained the victim's consent by artifice). The trial court explained that the means of committing robbery in the first degree are alternative methods *1039 of committing the same offense, that they are not contradictory, and that they do not contain separate and distinct elements of proof. Thus, although an individual can cause serious physical injury to another while armed with a deadly weapon or a dangerous instrument in conjunction in one course of conduct towards the commission of a robbery, a person cannot have sexual relations with a person without her consent and simultaneously with her consent by artifice.
In the present case, the proof at trial established that the appellant used force to overcome the victims' physical resistance in order to take certain property from them and, in so doing, caused serious physical injury to his victims while armed with a deadly weapon, specifically, a sword or knife. The Alabama statute for robbery in the first degree "contains alternative methods of committing the offense ... where the alternative methods are not contradictory and do not contain separate and distinct elements of proof." Gibson v. State, 488 So.2d 38, 40 (Ala.Cr.App.1986).

XI.
The appellant argues that the arresting officer improperly seized his suitcase without a warrant, and that it was not seized incident to his arrest. He argues, therefore, that the evidence gained as a result of that seizure was inadmissible. The record indicates that the appellant was apprehended in Chattanooga, Tennessee, at April and Micah Donaldsons', where he was staying. He argues that the Chattanooga police officer who made the arrest had been to that apartment on three occasions and, on the second time, April Donaldson gave him permission to look in the appellant's suitcase. On the officer's third visit, when the appellant was arrested, the appellant was allowed to get dressed, but the officer first checked his suitcase, purportedly to ensure that there was no weapon there. He argues that the black pants that the officer secured from his suitcase were not seized as an incident of his arrest, because the officer already knew that there was no weapon in the suitcase as a result of his previous examination of the suitcase. He further submits that April Donaldson improperly consented to the original search of the suitcase.
The appellant raises this argument for the first time on appeal; therefore, it must be analyzed pursuant to the plain error rule. Rule 45A, Ala.R.App.P.
The arresting officer, an officer with the Chattanooga Police Department, testified at trial that the dispatcher with the sheriff's department had received a warrant for the appellant's arrest and had gained information as to where the appellant might be staying. The arresting officer was made aware of these facts and received further information indicating that the appellant might have left that location, which was the Donaldsons' apartment. In an attempt to determine the appellant's whereabouts, he visited the apartment on three occasions on December 29, 1991at approximately 12:00 a.m.; at around 2:00 a.m.; and at between approximately 3:45 a.m. to 4:15 a.m. the same morning. He testified that on the first occasion, he spoke to a third party who was also living there. That individual indicated that he believed that someone other than the appellant was staying with the Donaldsons, thereby indicating that the appellant had left the apartment. The officer testified that he returned soon afterwards in hopes of determining from the Donaldsons where the appellant might have gone. April Donaldson was at home on the second occasion and told the officer that the appellant and her husband were out for the evening, but that they would return soon. She then gave the officer permission to look through the house. The officer testified as follows:
"I asked if I could checkif she minded if I checked the apartment because, as I stated, we had been informed by the sheriff's department that Mr. Price might be armed with I believe a large caliber pistol and some other weapons. And I felt that we might have to come back in there to get Mr. Price at some time. And I needed to check the apartment to make sure there was no weapons in there where any other officers or anybody would get hurt. And she agreed to let me in, so I checked the bedroom, the kitchen area a little bit, the living room where she said he had been *1040 sleeping, the couch area. In her bedroom, I believe Mr. Price's suitcase was in her bedroom. It was opened and there were some items of clothing in there.
"Q [Prosecutor]: All right. After you took possession of his suitcase, did you alter it or open it again or change anything?
"A [Officer]: At that time all I did, I left the suitcase on the floor. I went and bent over it. I separatedthere was just a few items of clothing. I separated them, just ran my hand through the clothing to make sure there was no weapon, pistol, no weapon in the suitcase, and I left it at that."
The officer returned to the apartment a final time around 4:00 a.m., accompanied by four or five other officers, and arrested the appellant. He testified that, when he entered the apartment, he found the appellant lying on the couch in the living room in front of a television set. The officer testified that the appellant had apparently prepared to go to sleep and was not wearing "much clothing." He testified that the appellant had to get dressed and so he walked to the bedroom of the apartment, where his suitcase was located. The officer testified that he accompanied the appellant and "did a quick look through the suitcase to make sure there was no weapon." He testified, "it was our understanding that he might be armed with a weapon. So, for our own safety we did look through the suitcase, got his clothing, closed the suitcase, let him get dressed. He put on a shirt and some pants and shoes and [we] took the suitcase and Mr. Price to the service center." Subsequently, the officer was asked if he saw April Donaldson put anything into the suitcase or take anything out of it while he was present arresting the appellant. The officer testified, "I believeI'm not positive, but I believe that after we arrested him that she gathered up the rest of his stuff that she had cleaned and put it in his suitcase. We told her that we were going to take him with us." The officer testified that he then put the suitcase in the trunk of the patrol car and placed the appellant in the backseat. He testified that, after they arrived at the service center, Detective Mathis of the Chattanooga Police Department called for the appellant to be brought to his office and the officer testified that he took the appellant and the suitcase to Detective Mathis's office.
When on his second visit to the apartment the officer ran his hand through the appellant's belongings in his suitcase, the search was proper as incident to a valid arrest, even though the search took place before the arrest, because the officer already had probable cause for the arrest at the time of that search. Moreover, the subsequent search of the appellant's suitcase was proper because it was in the suspect's immediate control upon his arrest as he changed his clothing; and it was legal and proper to search the suitcase at the station pursuant to an inventory search.
"After making a valid custodial arrest, the police may conduct a warrantless search of the suspect without probable cause or reasonable articulable suspicion to believe that the suspect possesses either weapons or evidence. The police officer's general need to disarm a suspect or to preserve evidence justifies this search, and its validity depends only on the legality of the arrest.
"The timing of a search incident to arrest must be reasonable under the circumstances. A search conducted immediately prior to an arrest may be justified as incident to arrest if the police had probable cause to arrest the suspect before conducting the search.168...
"...
"... [T]he police may make a full search of the suspect for both weapons and evidence during a search incident to arrest. The scope of the search is not limited to the suspect's person; the police officer may also search the area within the suspect's immediate control.173 ... Although searches of containers found on the suspect or within her reach are valid,176 once police gain exclusive control over the arrestee's personal property a later search of that property cannot be justified as incident to arrest.
168 ... See U.S. v. Donaldson, 793 F.2d 498, 502-03 (2d Cir.1986) (warrantless search of defendant's apartment before formal arrest valid as search incident to arrest when probable cause for arrest existed at time of search), cert. denied, *1041 479 U.S. 1056 [107 S.Ct. 932, 93 L.Ed.2d 983] (1987); U.S. v. Miller, 925 F.2d 695, 698 (4th Cir.) (warrantless search of defendant's belongings immediately before formal arrest valid as search incident to arrest when probable cause existed for arrest at time of search), cert. denied, 502 U.S. 833 [112 S.Ct. 111, 116 L.Ed.2d 80] (1991); U.S. v. Hernandez, 825 F.2d 846, 852 (5th Cir.1987) (warrantless search before formal arrest valid as search incident to arrest when arrest followed quickly on heels of search and probable cause for arrest existed before search), cert. denied, 484 U.S. 1068 [108 S.Ct. 1032, 98 L.Ed.2d 996] (1988); U.S. v. Armstrong, 16 F.3d 289, 294 (8th Cir.1994) (warrantless search before formal arrest valid as search incident to arrest when probable cause for arrest existed before search); ... U.S. v. Allan [Allen], 986 F.2d 1354, 1357 (10th Cir.1993) (warrantless search before formal arrest valid search incident to arrest when probable cause for arrest existed before search); U.S. v. Taylor, 997 F.2d 1551, 1554 (D.C.Cir.1993) (same).
"173Chimel v. California, 395 U.S. 752, 763 [89 S.Ct. 2034, 2040, 23 L.Ed.2d 685] (1969). In Chimel, the court construed `immediate control' to mean `the area from within which [the arrestee] might gain possession of a weapon or destructible evidence.' Id.... U.S. v. Morales, 923 F.2d 621, 626-27 (8th Cir.1991) (warrantless search of bags valid as incident to arrest when contemporaneous with arrest, arrestee held bags as officers approached, and was approximately three feet away and not handcuffed during search), and U.S. v. Nohara, 3 F.3d 1239, 1243 (9th Cir.1993) (warrantless search of bag valid as incident to arrest when contemporaneous with arrest and arrestee held bag as officers approached, even though arrestee handcuffed during search).
"The circuit courts have allowed searches of the room where the arrest occurred, of containers, and of vehicles, even after the arrestee has been immobilized. U.S. v. Bennett, 908 F.2d 189, 193 (7th Cir.) (warrantless search of luggage valid as incident to arrest even though defendants handcuffed and placed against wall of hotel room when officers knew that defendants used several different weapons during robberies and only one weapon in plain view), cert. denied, 498 U.S. 991 [111 S.Ct. 534, 112 L.Ed.2d 544] (1990)....
"176 ... U.S. v. Ivy, 973 F.2d 1184, 1187 (5th Cir.1991 [1992]) (search of defendant's briefcase valid as incident to arrest because within defendant's immediate control), cert. denied, [507 U.S. 1022] 113 S.Ct. 1826 [123 L.Ed.2d 455] (1993);... U.S. v. Herrera, 810 F.2d 989, 990-91 (10th Cir.1987) (search of briefcase valid as incident to arrest because within defendant's control); [Compare] U.S. v. Rosenthal, 793 F.2d 1214, 1232 (11th Cir.1986) (search of bag out of defendant's reach valid as incident to arrest because defendant moved toward it and would have taken it to jail with him), cert. denied, 480 U.S. 919 [107 S.Ct. 1377, 94 L.Ed.2d 692] (1987) and U.S. v. Tavolacci, 895 F.2d 1423, 1428-29 (D.C.Cir. 1990) (search of locked suitcase valid as incident to arrest because within defendant's reach) with U.S. v. Johnson, 18 F.3d 293, 295 (5th Cir.1994) (warrantless search of briefcase invalid when briefcase five or six feet away and out of defendant's reach)."
Twenty-Fourth Annual Review of Criminal Procedure: United States Supreme Court and Courts of Appeal 1993-1994, 83 Ge.L.J., 710-713 (March-April 1995).
"Other exceptions to the warrant requirement apply after a lawful seizure of either a container or an individual. For example, contemporaneous with a custodial arrest, the police may open any container within the arrestee's reach.287 Based on reasonable suspicion, the police may detain luggage for a brief inspection, such as a dog sniff. Finally, the police do not need a warrant to conduct an inventory search of a lawfully seized container.289
"... After lawfully taking custody of property, the police may conduct a warrantless search of the property to satisfy three distinct purposes: (1) protection of the owner's property while it is in police custody, (2) protection of the police against claims of lost or stolen property, and (3) protection of the police from potential danger. Because the policy governing the search is production of an inventory, the police may not conduct an inventory search if acting in bad faith or if done solely for investigatory purposes. To prevent the police from conducting a general rummaging for incriminating evidence, the Supreme Court has required that an inventory search be conducted according to standardized criteria.293 Within the framework of these criteria, however, police officers may use their discretion to determine both the scope and propriety of the inventory search,294 and are not required to use the least intrusive means to secure property lawfully in their possession.295 Further, noninvestigatory motives will validate an inventory search, even when an officer suspects that contraband or evidence will be found.296 Because inventory searches are not investigatory in nature, the absence of a warrant and probable cause is immaterial to the reasonableness of the search under the Fourth Amendment.
*1042 "... Containers and items in the possession of an individual lawfully detained by the police may also be the subject of an inventory search303....
"287 See New York v. Belton, 453 U.S. 454, 460 [101 S.Ct. 2860, 2864, 69 L.Ed.2d 768] (1981) ... A search incident to a lawful arrest requires no justification and can be made of the person arrested and the area within his or her control.
"289 See U.S. v. Judge, 864 F.2d 1144, 1145-47 (5th Cir.1989) (inventory search of closed backpack in car trunk valid when backpack impounded according to standard DEA procedures regarding the safekeeping of arrestee's personal belongings), cert. denied, 495 U.S. 918 [110 S.Ct. 1946, 109 L.Ed.2d 309] (1990); U.S. v. Porter, 859 F.2d 83-84 (8th Cir.1988) (per curiam) (inventory search of locked briefcase within car trunk valid based on lawful seizure of car used in drug transaction); U.S. v. Bowhay, 992 F.2d 229, 231 (9th Cir.1993) (inventory search of satchel valid when satchel seized during arrest and inventoried pursuant to mandatory departmental procedure).
"293 [Florida v.] Wells, 495 U.S. [1] at 4 [110 S.Ct. 1632, 1635, 109 L.Ed.2d 1 (1990)]. The Wells Court did not delineate any particular set of procedures ....
"The police department is allowed to develop its own standardized inventory procedures, as long as they are reasonable and administered in good faith compliance with the Fourth Amendment, [Colorado v.] Bertine, 479 U.S. [367] at 374 [107 S.Ct. 738, 742, 93 L.Ed.2d 739 (1987)]. The courts of appeals have permitted minor record-keeping deviations from the prescribed procedures, but not deviations involving the manner or predicate for the search....
"The Third, Fourth, and Ninth Circuits have upheld unwritten standardized inventory procedures. U.S. v. Frank, 864 F.2d 992, 1002 (3d Cir.1988) (standard procedure requirement met when unwritten procedures require impounding officer to conduct inventory search of impounded vehicle), cert. denied, 490 U.S. 1095 [109 S.Ct. 2442, 104 L.Ed.2d 998] (1989); U.S. v. Ford, 986 F.2d 57, 60 (4th Cir.1993) (inventory search valid when department had standardized, unwritten procedures); U.S. v. Mancera-Londono, 912 F.2d 373, 375 (9th Cir.1990) (same).
"294 Wells, 495 U.S. at 6 [110 S.Ct. at 1636].... U.S. v. Williams, 936 F.2d 1243, 1248-49 (11th Cir.1991) (on-site inventory search, rather than search at impound lot, permissible because officer had authority to impound vehicle), cert. denied, [503 U.S. 912] 112 S.Ct. 1279 [117 L.Ed.2d 504] (1992).
"295 See Bertine, 479 U.S. at 375 [107 S.Ct. at 743] (police not required to allow drive option to avoid impoundment and subsequent inventory search by leaving car in public parking lot); [Illinois v.] Lafayette, 462 U.S. [640] at 647 [103 S.Ct. 2605, 2610, 77 L.Ed.2d 65 (1983)] (police not required to avoid inventory search by securing bag by placing it in sealed bag or locker);... U.S. v. Caves, 890 F.2d 87, 95 (8th Cir.1989) (police not required to avoid inventory search by securing purse in locker).
"296 See U.S. v. Rodriguez-Morales, 929 F.2d 780, 878 [787] (1st Cir.1991) (inventory search not invalid when caretaking motive not mere subterfuge for coexisting investigatory motive), cert. denied, 502 U.S. 1030 [112 S.Ct. 868, 116 L.Ed.2d 774] (1992); U.S. v. Frank, 864 F.2d 992, 1001 (3d Cir.1988) (inventory search not invalid when noninvestigatory motive present in addition to motive to investigate known fugitive), cert. denied, 490 U.S. 1095 [109 S.Ct. 2442, 104 L.Ed.2d 998] (1989); U.S. v. Gallo, 927 F.2d 815 819 (5th Cir.1991) (inventory search by local police officer not invalid when allowed by standard procedures, despite additional investigatory motive of DEA officer present); Wagner v. Higgins, 754 F.2d 186, 189-90 (6th Cir.1985) (inventory search not invalid when legitimate desire to protect against claims of conversion present in addition to motive to discover evidence of crime); U.S. v. Lewis, 3 F.3d 252, 254 (8th Cir.1993) (per curiam) (inventory search not invalid even when police officers testified vehicle searched for `things of value' or any other type [of] contraband'), cert. denied, [511 U.S. 1111] 114 S.Ct. 2111 [128 L.Ed.2d 671] (1994); U.S. v. Bowhay, 992 F.2d 229, 231 (9th Cir.1993) (inventory search of satchel not invalid even if officer had additional investigative motive); U.S. v. Roberson, 897 F.2d 1092, 1096 (11th Cir.1990) (same).
"303 Lafayette, 462 U.S. at 648 [103 S.Ct. at 2610-11] (inventory search of arrestee's bag valid); U.S. v. Loaiza-Marin, 832 F.2d 867, 868 (5th Cir.1987) (per curiam) (same); U.S. v. Woolbright, 831 F.2d 1390, 1394-95 (8th Cir. 1987) (same); U.S. v. Nohara, 3 F.3[d] 1239, 1243 (9th Cir.1993) (same)."
Twenty-Fourth Annual Review of Criminal Procedure: United States Supreme Court and Courts of Appeal 1993-1994, 83 Geo.L.J., 743-47 (March-April 1995).
In Jones v. State, 680 So.2d 964, 967 (Ala. Cr.App.1996), the defendant was taken into custody by a police officer at a fire station shelter. When asked if he wished to bring any personal belongings with him, the defendant stated that he had a suitcase. The suitcase was subsequently searched and, although a warrant was obtained before the search, this Court held that the evidence contained in the briefcase was obtained as a result of a valid inventory search.
"`A police inventory of some possession of the arrestee, such as a suitcase, presupposes that the police had some valid reason for taking custody of that object, *1043 or it is only because of such taking of custody that the police can be said to have some obligation to safeguard the contents. This presents no problem when a person is arrested in some public place while carrying a suitcase or like object for it would be clearly improper for police to simply leave the container unattended at the scene of the arrest. As noted by Justice Blackmon in United States v. Chadwick [, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977)]:
"`"A person arrested in a public place is likely to have various kinds of property with him: items inside his clothing, a briefcase or suitcase, packages or a vehicle. In such instances the police cannot very well leave the property on the sidewalk or street.... I think it is surely reasonable for the police to take the items along to the station with the arrested person."
"`Likewise, if a person is arrested in a public place and it is known that he will thereby be prevented from retrieving a suitcase belonging to him which is in the vicinity, perhaps checked aboard a soon-to-depart aircraft, it is again appropriate for the police of take custody of it.'
"W.LaFave, 3 Search and Seizure, § 5.5(b), 180-181 (3d Ed.1996)."
Jones v. State, supra, at 967-68.
In the present case, there is little evidence concerning the seizure of the black pants from the appellant's suitcase, because the appellant did not challenge this search and seizure at trial. Although there is no indication that a warrant was obtained before the search, there is also no direct evidence that the search was warrantless.[4] Moreover, the standard operating procedures of the Fayette County, Tennessee, Sheriff's Office, concerning the method of inventorying personal property of persons in custody, does not appear in the record. However, the record establishes that there was no plain error committed by the admission into evidence of the black pants.

XII.
The appellant argues that during his closing argument at the sentencing phase of the trial the prosecutor impermissibly commented that the appellant would probably kill again unless he was put to death; the appellant argues that this comment "sullied" the trial with inflammatory and unsupported speculation. The record indicates that the appellant failed to object to this comment at trial; therefore, any error in the prosecutor's argument to the jury must be analyzed pursuant to the plain error standard. Rule 45A, Ala.R.App.P. The comment made by the prosecutor during his closing argument at the sentencing phase was as follows:
"One of the most vivid descriptions of what happened to Bill Lynn, on the stand that came forth in my listening to the testimony, was what the little EMT girl said about trying to move his head. Do you remember that? He was cut so severely that she put her hand entirely, all four fingers, inside the wounds on his head and tried to move it and couldn't even turn his head. His entire scalp moved around his head and, that is, the bone structure would not move. If there has ever been a more heinous, cruel, or atrocious infliction of death on any individual in Fayette County, I haven't heard about it.
"Now, the only way that I know of to assure that Chris Price is not a threat, doesn't have an opportunity to inflict this kind of injury on anyone else in Fayette County, is to have the jury recommend a sentence of death on him. That sentence recommendation to the Court will demonstrate to any individual in this county contemplating a similar action, will demonstrate the conscience of this community that it will not be tolerated. I seriously ask you to make that recommendation to the Court. And in asking you to do that, I realize that this is not a duty you would have chosen."
The appellant argues that this argument by the prosecutor was reversible error, based on the Alabama Supreme Court's holding in Ex parte Smith, 581 So.2d 531 (Ala.1991). See also Ex parte Washington, 507 So.2d *1044 1360 (Ala.1986). However, the comment in Ex parte Smith, 581 So.2d at 532, was made by the prosecutor during the guilt phase of the defendant's trial and, in holding that the comment constituted plain error, the Court determined that the prosecutor had attempted to prove guilt by arguing that the defendant would commit future illegal acts.[5] However, a review of the entire argument by the prosecutor in the present case reveals that the prosecutor was not arguing that the appellant would kill again if he was not sentenced to death, but that such a sentence would act as a deterrent to other possible offenders. Similarly, in Carroll v. State, 599 So.2d 1253, 1270 (Ala.Cr.App.1992), aff'd, 627 So.2d 874 (Ala.1993), cert. denied, 510 U.S. 1171, 114 S.Ct. 1207, 127 L.Ed.2d 554 (1994), the prosecutor stated during his argument at the penalty phase, "How many people does [the defendant] get to kill?" In construing the prosecutor's argument to be a plea for law enforcement, this Court stated:
"Although we do not approve of [this argument], we do not consider it to constitute reversible error. [It] can be interpreted as merely an argument for law enforcement and society's right of self-protection, Kuenzel v. State, 577 So.2d 474, 503-04 (Ala.Cr.App.), affirmed, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991), rather than an improper comment on the possibility that the appellant will commit future illegal acts, Ex parte Smith, 581 So.2d 531, 533 (Ala.1991)." 599 So.2d at 1270.
In Williams v. State, 601 So.2d 1062, 1072-73 (Ala.Cr.App.1991), aff'd, 662 So.2d 929 (Ala.1992), cert. denied, 506 U.S. 957, 113 S.Ct. 417, 121 L.Ed.2d 340 (1992), the prosecutor, during his closing argument at the guilt phase of the defendant's trial, argued that the defendant admitted the murder by the allegorical statement "`I ate the mouse.'" The prosecutor then stated that the defendant had also stated, "`I ate the little mouse and I will eat another little mouse if you give me a chance.'" Although the defendant in Williams v. State claimed that this argument was a comment by the prosecutor that he would kill again, this Court held that the statement was a legitimate argument in response to a statement made by the defendant to third parties and admitted earlier at trial. This Court stated, "Furthermore, `[s]tatements of counsel in arguments to the jury must be viewed as having been made in the heat of debate, and such statements are usually valued by the jury at their true worth.'" Williams v. State, supra, at 1073, quoting Stephens v. State, 580 So.2d 11 (Ala.Cr.App.1990), affirmed, 580 So.2d 26 (Ala.1991), cert. denied, 502 U.S. 859, 112 S.Ct. 176, 116 L.Ed.2d 138 (1991).
This comment made by the prosecutor did not constitute plain error.

XIII.
The appellant argues that the State failed to prove that he had waived his rights pursuant to Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), before giving statements to the Tennessee authorities and to the Alabama officials. Therefore, he argues that the trial court erred in failing to suppress the statements. The appellant specifically bases this argument on two grounds: that the State failed to lay a sufficient voluntariness predicate in order for his statements to be properly admitted; and that he was improperly induced into making the statement by a Tennessee official's comment that, if the appellant would give a statement, he would make the appellant's cooperation known to others.

A.
The appellant argues that, when he gave his statements, he was young, and he had little education and a history of emotional turbulence and family violence. He argues that the record fails to indicate that he was adequately advised of his rights, in that there is a blanket assertion by the Tennessee authorities *1045 that he was advised of his rights and a Tennessee official testified that he reviewed a waiver of rights form with the appellant twice before the statements were made. However, the appellant argues that the record fails to enumerate the rights that were given. As to the subsequent statement given by the appellant when he was returned to Alabama, the appellant alleges that the record indicates that the sheriff of Fayette County testified that a deputy read the appellant's constitutional rights to him before taking a statement, but the appellant argues that, as no further predicate was laid, this testimony was insufficient.
However, a review of the record concerning the suppression hearing, as well as the testimony presented at trial before the statements were admitted, indicates that the appellant's claims are unfounded. The State provided ample evidence that the appellant had been properly advised of his constitutional rights and had knowingly, intelligently, and voluntarily waived them. The appellant was originally arrested in Chattanooga, Tennessee, and taken to the Chattanooga Police Department. There, he was taken to Detective Mathis who later testified at the suppression hearing and at trial. Detective Mathis testified that he advised the appellant of his constitutional rights using a written rights form that was explained to the appellant and that he signed. He was then shown a waiver form and he signed that form as well. Thereafter, the appellant's statement was to be tape-recorded and, Detective Mathis testified that, after the recorder was turned on, his rights were again explained to the appellant in detail from the form and the nature of the waiver form was also again explained, following which the appellant agreed to give a statement. At trial, Detective Mathis also testified that the appellant was asked about his education level and asked to whether he understood each part of the form; and the appellant acknowledged that he did. Moreover, during the trial, Detective Mathis testified by summarizing the content of the form and enumerated the appellant's constitutional rights. He testified that the appellant replied, "Yes, sir," when asked if he understood these rights. Detective Mathis also testified that the appellant was neither threatened nor offered any promise or hope of reward in return for his statement. He testified that the appellant was given breakfast and was allowed to smoke, drink soft drinks, and use the restroom at will. A transcribed copy of the appellant's statement was authenticated and admitted at trial.
Sheriff Turner of Fayette County, Alabama, testified that the appellant was transported back to Alabama from Tennessee. He testified that his secretary transcribed the Tennessee tapes. He further stated that the appellant gave a statement to him in the presence of two other deputies. He testified that one of these deputies advised the appellant of his constitutional rights before taking his statement. This fact was also noted on the tape of this subsequent statement taken in Alabama. Sheriff Turner also testified that the appellant was not threatened and that no promise or inducement was made in order to obtain his statement.
"The oft-stated rule is that a confession is prima facie involuntary and inadmissible, and the state must show voluntariness and a Miranda predicate in order for it to be admitted. Thomas v. State, 373 So.2d 1167 (Ala.1979), vacated on other grounds, 448 U.S. 903, 100 S.Ct. 3042, 65 L.Ed.2d 1133 (1980); Lewis v. State, 295 Ala. 350, 329 So.2d 599 (1976); Magwood v. State, 494 So.2d 124 (Ala.Cr.App.1985), aff'd, 494 So.2d 154 (Ala.), cert. denied, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986). Whether there was a waiver of the right to remain silent and the right to counsel and whether it was knowingly, voluntarily, and intelligently made must be decided from the particular facts and circumstances of each case, including the background, experience, and conduct of accusedthe totality of the circumstances. Thomas v. State; Magwood v. State; Chandler v. State, 426 So.2d 477 (Ala.Cr.App.1982) (citing Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981)). The question of whether a confession was voluntary is initially to be determined by the trial court. Ex parte Singleton, 465 So.2d 443 (Ala.1985). Thereafter, the voluntariness as affecting the credibility and weight to *1046 be given any statement that an accused has made is a determination for the jury. Id. The finding of the trial court will not be disturbed on appeal unless it appears contrary to the great weight of the evidence or is manifestly wrong. Magwood v. State; Marschke v. State, 450 So.2d 177 (Ala.Cr. App.1984). Even where there is credible testimony to the contrary, if the evidence is fairly capable of supporting the inference that the rules of freedom and voluntariness were observed, the ruling of the trial judge need only be supported by substantial evidence and not to a moral certainty. Chambers v. State, 455 So.2d 1008 (Ala.Cr.App.1984); Bennett v. State, 409 So.2d 936 (Ala.Cr.App.1981), cert. denied, 457 U.S. 1137, 102 S.Ct. 2968, 73 L.Ed.2d 1356 (1982). The trial court need only be convinced from a preponderance of the evidence to find a confession to have been voluntarily made. Ex parte McCary, 528 So.2d 1133 (Ala.1988); Ex parte Singleton. The fundamental requirements for voluntariness are that the court must conclude, in order to find a defendant's confession voluntary, that he made an independent and informed choice of his own free will, that he possessed the capability to do so, and that his will was not overborne by pressures and circumstances swirling around him. Jurek v. Estelle, 623 F.2d 929 (5th Cir.1980) (en banc), cert. denied, 450 U.S. 1001, 101 S.Ct. 1709, 68 L.Ed.2d 203 (1981); Magwood v. State; Harris v. State, 420 So.2d 812 (Ala.Cr.App.1982). It is well settled that the mere fact that a defendant is functionally illiterate or simple-minded will not vitiate the voluntariness of his confession. Cliff v. State, 518 So.2d 786 (Ala.Cr.App.1987). The low mentality of a defendant should go to the weight and credibility of the confession rather than to its admissibility. Elrod v. State, 281 Ala. 331, 202 So.2d 539 (1967). A defendant's mental impairment, even if it exists, is merely one factor affecting the validity of his waiver of rights and the voluntariness of his confession. Whittle v. State, 518 So.2d 793 (Ala.Cr.App.1987); Sasser v. State, 497 So.2d 1131 (Ala.Cr.App.1986). See generally, Annot. 8 A.L.R.4th 16 (1981). We, therefore, look to the totality of the circumstances surrounding appellant's statements to determine whether the record supports the finding of the trial court and the admission of the statements into evidence."
Lewis v. State, 535 So.2d 228, 234-35 (Ala.Cr. App.1988). See also Holliday v. State, 641 So.2d 325, 327 (Ala.Cr.App.1994).
In the present case, the totality of the circumstances indicates that the State laid a proper predicate to allow the admission into the evidence of the appellant's statements.

B.
The appellant argues that his statement, which was given while he was in Chattanooga, Tennessee, was involuntary because it was improperly induced by an officer's comment that he would make the appellant's cooperation known to others. The record indicates that, during the suppression hearing, Detective Mathis testified that, although he did not tell the appellant that "it would go easier on him," he "very possibly could have said that [he] would be willing to say that [the appellant] cooperated." He further testified as follows: "That's something that I frequently will say that I do tell people. You know, if they cooperate, then I will be the first to say that, `Yes, they did.'" Defense counsel then asked the witness if the appellant had cooperated with him and the officer stated, "Very much so." Defense counsel then asked, "But you made no promise of reward or hope of reward for anything that he would tell you?" The witness responded, "No, ma'am. I would have asked him on tape if I did. No, I did not. He also acknowledged how he was treated while in the custody of the Chattanooga Police Department on tape when he was in there." There is no indication in the record that the officer actually made a statement that he would make the appellant's cooperation known to others, only the possibility that he may have done so. There is no indication in the record that the appellant's statement was "bargained for," i.e., that it was conditioned upon the officer's relating to officials that the appellant was cooperative.
In Gaddy v. State, 698 So.2d 1100 (Ala.Cr. App.1995), aff'd, 698 So.2d 1150 (Ala.1997), *1047 the interrogating officer stated that, before he took the defendant's statement, he told him that, "if this case came to court, that I would not have any problems stating to the Judge or a jury that [the defendant] was cooperative, and [I] found him to be truthful." However, a review of the totality of the circumstances surrounding the defendant's statement, including this remark by the officer, indicated that the statement was voluntary and was not given pursuant to an improper promise or inducement. This Court stated:
"[T]he situation in Ex parte Weeks [531 So.2d 643 (Ala.1988)], supra, is distinguishable from that in the instant case. The officer in Ex parte Weeks actually bargained with the defendant, by stating that if the defendant confessed, he would make his cooperation known to the district attorney. In this case, the officer informed the defendant that he was going to make his cooperation known to the court unconditionally; thus, the confession was not actually `bargained for' or directly induced. Moreover, in Ex parte Weeks, supra, at 644, the officer acknowledged on cross-examination that he would `"give something favorable to [the defendant] if he would help."' In the present case, the interrogating officer consistently stated that he made the appellant no promises and offered no hope for rewards. The officer simply told the appellant that he would make his cooperation known to the court and, subsequently, stated that he in fact did so.
"`Generally, the line to be drawn between permissible police conduct and conduct deemed to induce or to tend to induce an involuntary statement does not depend upon the bare language of inducement but rather upon the nature of the benefit to be derived by a defendant if he speaks the truth, as represented by the police.
"`... [T]he cases indicate that government agents may validly make some representations to defendant or may discuss cooperation without rendering the resulting confession involuntary. Thus, government agents may initiate conversations on cooperation, and may promise to make defendant's cooperation known to the prosecutor or the court, so long as the interrogators make it clear that they have no power to grant immunity or confer other benefits.'
"Jackson v. State, 562 So.2d 1373, 1383 (Ala.Cr.App.1990), quoting 23 C.J.S. Criminal Law § 907 (1989) (footnotes omitted).
"`"[A] representation that the fact of cooperation will be made known to prosecuting authorities is insufficient to make a confession involuntary. United States v. Curtis, 562 F.2d 1153 (9th Cir.), cert. denied, 439 U.S. 910, 99 S.Ct. 279, 58 L.Ed.2d 256 (1978)." United States v. Prescott, 480 F.Supp. 554, 559 (W.D.Penn.1979) (The defendant alleged that his oral statements were involuntary because his cooperation was induced by a promise that if he cooperated the F.B.I. Agents would tell the United States Attorney and it would go easier on him.) "[T]elling the [defendant] in a noncoercive manner of the realistically expected penalties and encouraging [him] to tell the truth is no more than affording [him] the chance to make an informed decision with respect to [his] cooperation with the government." United States v. Ballard, 586 F.2d 1060, 1063 (5th Cir.1978) (Defendant told that in return for her cooperation the government would make a recommendation and inform the court of her cooperation); United States v. Morris, 491 F.Supp. 226 (S.D.Ga.1980) (F.B.I. agents told defendant: "If you cooperate, it will go easy on you," and further told him the possible penalties for armed robbery.) See also United States v. Hart, 619 F.2d 325 (4th Cir.1980); United States v. Jacks, 634 F.2d 390 (8th Cir.1980); United States v. Grant, 622 F.2d 308 (8th Cir.1980); Wallace v. State, 290 Ala. 201, 275 So.2d 634 (1973); Moss v. State, 347 So.2d 569 (Ala.Cr.App.1977); Tanner v. State, 57 Ala.App. 254, 327 So.2d 749 (1976).'
"Bennett v. State, 409 So.2d 936, 940 (Ala. Cr.App.1981), cert. denied, 457 U.S. 1137, 102 S.Ct. 2968, 73 L.Ed.2d 1356 (1982).

*1048 "In determining whether a statement was obtained by coercion or by improper inducement, all surrounding circumstances of the statement and the defendant must be examined in a totality of the circumstances analysis. Boulden v. Holman, 394 U.S. 478, 89 S.Ct. 1138, 22 L.Ed.2d 433 (1969); Beecher v. Alabama, 389 U.S. 35, 88 S.Ct. 189, 19 L.Ed.2d 35 (1967); Eakes v. State, 387 So.2d 855 (Ala.Cr.App.1978). `The true test of determining whether extrajudicial confessions are voluntary is whether the defendant's will was overborne at the time he confessed and therefore not the product of a rational intellect and a free will. Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963); Elliott v. State, 338 So.2d 483 (Ala. Cr.App.1976).' Eakes v. State, supra at 859."
Gaddy v. State, 698 So.2d at 1113-14. Cf. McLeod v. State, 718 So.2d 723 (Ala.Cr.App. 1996) (officer's conduct was found to be similar to that of the officer in Ex parte Weeks, so that the statement was a bargained-for confession).
A totality-of-the-circumstances review of a claim of improper inducement must include both the circumstances surrounding the confession and the characteristics of the individual defendant. Gaddy v. State, 698 So.2d at 1114. In the present case, the officer stated consistently that he did not improperly induce the appellant or make any promises in return for the appellant's statement. He further concluded that the appellant's statement was voluntarily given. He also testified that he was uncertain as to whether he had made a statement concerning the effect of the appellant's cooperation, but that he tended to make that statement to those individuals who did cooperate, thus indicating that the promise was made after the cooperation was received and that it was, therefore, not conditional. Moreover, as the Court noted in Gaddy v. State, while the interrogating officer clearly did not view the remark as a bargained-for condition of the appellant's statement, the appellant apparently did not previously consider it an improper inducement in that he did not raise this claim at trial, which weighs heavily against any claim of prejudice.[6]Kuenzel v. State, 577 So.2d 474, 489 (Ala.Cr.App.1990), affirmed, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991). There is no support in the record for the appellant's claim that any such remark by the officer induced his statement.
As to the personal characteristics of this appellant, the record indicates that the appellant was 19 years old at the time of the offense and that he had dropped out of school after finishing the eleventh grade. He was found to have been of average intelligence and the pre-sentence report stated he had gone back to the school, after completing boot camp. A review of this presentence investigative report indicates the following concerning the appellant's reputation and community activities:
"According to the Preliminary Report from Walker County[,] Price has a bad reputation in Walker County. Juvenile authorities reported that Price had not benefitted from the services of the Juvenile Court while he was under Juvenile Supervision. They report, `Chris has not made use of the counseling, and direction offered by this office!' ...
"Price was subsequently transferred to Walker County Adult Court on ... Burglary and Receiving Stolen Property charges. He was sentenced in Adult Court and ordered to attend the 180-Day Boot Camp Program within the State System. He finished the Boot Camp Program and his probation period was made active."
Although the trial court found as a statutory mitigating circumstance that the appellant had no significant history of prior criminal activity, the Court noted that the certified records of the circuit clerk's office indicated that the appellant had previously pleaded guilty to charges of criminal trespass, auto burglary, criminal mischief, and receiving stolen property, all in September 1990. The trial court noted that all of these crimes appeared to be related to and to have arisen out of the same series of events. The trial *1049 court concluded that the prior offenses showed a "history of criminal activity to some degree," but the trial court concluded that they were insufficient to indicate a significant history of prior criminal activity. However, for the purposes of determining whether the appellant had been improperly coerced into giving his statement, his exposure to the criminal justice system indicates that "he was no stranger to the criminal justice system." Gaddy v. State, 698 So.2d at 1114. Similarly, this court has concluded that a defendant was sufficiently "familiar with the workings of the criminal justice system" for purposes of determining that his will was not overborne by improper inducement in making his statement, in Clemons v. State, 720 So.2d 961 (Ala.Cr.App.1996). In that case the defendant had been previously convicted of carjacking and had been sentenced to three years as a youthful offender.
A trial court's determination that a defendant's statement was voluntarily given need be supported by only substantial evidence, and great weight is to be given to this decision; moreover, this determination will not be disturbed on appeal unless this Court is convinced that the judgment is palpably contrary to the weight of the evidence. Bennett v. State, 409 So.2d 936, 939 (Ala.Cr.App. 1981), cert. denied, 457 U.S. 1137(198), 102 S.Ct. 2968, 73 L.Ed.2d 1356, citing Thompson v. State, 347 So.2d 1371 (Ala.Cr.App.), cert. denied, 347 So.2d 1377 (Ala.1977), cert. denied, 434 U.S. 1018, 98 S.Ct. 740, 54 L.Ed.2d 765 (1978). In the present case, the trial court's conclusion that the statement was voluntary is not contrary to the weight of the evidence.

XIV.
The appellant argues that the trial court's failure to instruct the jury that it could convict him of capital murder only if it found that he had formed the intent to commit robbery before or during the killing violated his constitutional rights. The record indicates that the appellant failed to object on this ground at trial; thus, any error must be analyzed pursuant to the plain error doctrine. Rule 45A, Ala.R.App.P. However, a review of the entire charge given by the trial court indicates that the jury was properly informed that the appellant's intent to commit the robbery must have been formed before or at the time of the killing. The trial court instructed the jury on several occasions, in order to constitute capital murder, that the intentional murder must be committed during the robbery in the first degree and that the appellant must have intended to commit the robbery.
Moreover, the evidence at trial clearly established that the intent to commit the robbery was formed before the killing. The appellant's theory of defense was that, while he intended to rob the victims, he did not intend to commit the murder. He argues that all of the preparation undertaken before the offense was done with the belief that he would be committing a robbery. There was no evidence that the intent to rob was an afterthought, nor was there any evidence from which the jury could properly so conclude in arriving at its verdict of guilty of capital murder.

XV.
The appellant argues that the trial court improperly denied his motion for a change of venue, because, he says, he made a clear showing of media saturation and because of the potential jurors' familiarity with the facts of the offense. In his brief on appeal, the appellant cites language by defense counsel in his motion for a change of venue specifically alluding to the fact that the victim was well known in the community, and that the crime was very sensational based on the fact that the victim was a preacher and it was committed during the Christmas season.
In Smith v. State, 646 So.2d 704 (Ala.Cr. App.1994), the defendant had filed a motion for change of venue, arguing that "`[t]he alleged [murder] victim, Milton R. Russell, was a well-known citizen and business owner in this county for many years. He had high public visibility and his alleged murder evokes great passion and prejudice in this community.'" Id. at 705. During the voir dire questioning of the venire, the panel was asked how many of them had heard of the murder "from any source whatsoever," and every veniremember stood. Id. at 706. *1050 However, this Court concluded that the defendant failed to show that the publicity had prejudiced the venire against him; as 19 of the 25 veniremembers challenged for cause by the appellant were removed and each of the remaining veniremembers stated that he or she could be fair and impartial, and base a decision on the evidence presented at trial. This Court stated:
"`It is well established in Alabama ... that the existence of pretrial publicity, even if extensive, does not in and of itself constitute a ground for changing venue and thereby divesting the trial court of jurisdiction of an offense.' Ex parte Fowler, 574 So.2d 745, 747 (Ala.1990).
"`The defendant has failed to satisfy the test set out in Ex parte Grayson, 479 So.2d 76, 80 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985), because he has not proved that "there existed actual prejudice against the defendant or that the community was saturated with prejudicial publicity." "Newspaper articles or widespread publicity, without more, are insufficient to grant a motion for change of venue." Id. "The standard of fairness does not require jurors to be totally ignorant of the facts and issues involved." Id. "The relevant question is not whether the community remembered the case, but whether the jurors at [the defendant's] trial had such fixed opinions that they could not judge impartially the guilt of the defendant." Patton v. Yount, 467 U.S. 1025, 1035, 104 S.Ct. 2885, 2891, 81 L.Ed.2d 847 (1984).
"`"To ensure that the defendant has a fair and impartial jury, it is not necessary that the veniremembers be totally ignorant of the facts surrounding the case. Murphy v. Florida, 421 U.S. 794, 799, 95 S.Ct. 2031, 2035, 44 L.Ed.2d 589 (1975). `It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.' Irvin v. Dowd, 366 U.S. 717, 724, 81 S.Ct. 1639, 1643, 6 L.Ed.2d 751 (1961)."

"`Ex parte Whisenhant, 555 So.2d 235, 238 (Ala.1989).'
"Kuenzel v. State, 577 So.2d 474, 483-84 (Ala.Cr.App.1990), affirmed, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991).
"`It is not required ... that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.'
"Irvin v. Dowd, 366 U.S. 717, 722-23, 81 S.Ct. 1639, 1642-43, 6 L.Ed.2d 751 (1961).
"`A criminal defendant is not constitutionally entitled to trial by jurors ignorant about relevant issues and events.... "The relevant question is not whether the community remembered the case, but whether the jurors ... had such fixed opinions that they could not judge impartially the guilt of the defendant."... In determining the existence of presumptive prejudice, a court must consider the totality of the circumstances, including the type of pretrial publicity, the time lapse between peak publicity and the trial, and the credibility of prospective jurors who indicate during voir dire that they could be impartial despite having been exposed to pretrial publicity about the case.... We note that "the presumptive prejudice standard ... is only `rarely' applicable... and is reserved for an `extreme situation.'"... "In short, the burden placed upon the petitioner to show that *1051 pretrial publicity deprived him of his right to a fair trial before an impartial jury is an extremely heavy one."'
"United States v. Lehder-Rivas, 955 F.2d 1510, 1524 (11th Cir.), cert. denied, 506 U.S. 924, 113 S.Ct. 347, 121 L.Ed.2d 262 (1992).
"Our review convinces this Court that the trial judge did not abuse his discretion in denying the motion for a change of venue.
"`"The trial court's findings of impartiality should be overturned only for `manifest error.' Irvin v. Dowd, 366 U.S. 717, 724, 81 S.Ct. 1639, 1643, 6 L.Ed.2d 751 (1961)." Fortenberry v. State, [545 So.2d 129 (Ala.Cr.App.1988), affirmed, 545 So.2d 145 (Ala.1989), cert. denied, 495 U.S. 911, 110 S.Ct. 1937, 109 L.Ed.2d 300 (1990)]. "Absent a showing of abuse of discretion, a trial court's ruling on a motion for change of venue will not be overturned. Ex parte Magwood, 426 So.2d 929, 931 (Ala.), cert. denied, 462 U.S. 1124, 103 S.Ct. 3097, 77 L.Ed.2d 1355 (1983)." Ex parte Grayson, 479 So.2d [76, 80 (Ala.1985), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985)]. We find no abuse of discretion by the trial court or manifest error in his finding of impartiality.'

"Oryang v. State, 642 So.2d 979 (Ala.Cr. App.1993) (every member of venire indicated that they had been exposed to pretrial publicity). See also Thomas v. State, 539 So.2d 375, 394 (Ala.Cr.App.) (`[a]t the beginning of voir dire, every member of the venire stated he or she had read or heard about this case'), affirmed, 539 So.2d 399 (Ala.1988), cert. denied, 491 U.S. 910, 109 S.Ct. 3201, 105 L.Ed.2d 709 (1989). Here, as in Thomas, 539 So.2d at 395, the appellant has `failed to show a connection between the pre-trial publicity and the existence of actual jury prejudice.'"
Smith v. State, 646 So.2d at 706-07.
Similarly, in Grayson v. State, 479 So.2d 69, 73-74 (Ala.Cr.App.1984), aff'd, 479 So.2d 76 (Ala.1985), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985), the defendant made a motion for a change of venue because "`pretrial publicity coupled with the nature of the crime and the fact that the deceased was well-known in the small community created such an air of prejudice in the county" as to deny him a fair trial." Id. at 73. In support of his motion, the appellant introduced the results of a poll conducted in the community and newspaper articles. However, during the voir dire questioning, the trial court asked if any veniremembers had a fixed opinion concerning the defendant's guilt and whether they knew anything of the facts of the case. The record indicated that no veniremember responded to either question. This Court held that a juror need not be ignorant of the facts or issues involved in a case in order to satisfy the requirements of impartiality.
In Williams v. State, 565 So.2d 1233, 1237-38 (Ala.Cr.App.1990), the defendant argued that the trial court improperly denied his motion for a change of venue based on alleged prejudicial pretrial publicity and biased community atmosphere. Moreover, "[t]he defendant contends that the prejudicial publicity was heightened by the fact that Mrs. Sennett, the victim, was the wife of a prominent minister and pastor of the Westside Church of Christ in Sheffield; by the brutal and horrifying manner in which Mrs. Sennett was beaten and stabbed to death; and by the subsequent suicide of Mr. Sennett. The record in that case indicated that most of the publicity occurred immediately after the offense and that the trial did not follow for another year. Furthermore, 16 members of the venire indicated that they were familiar with the facts and circumstances of the offense; 8 of those stated that the publicity had affected their opinion. All 8 of these veniremembers were removed for cause. Thus, this Court concluded that the defendant failed to properly prove partiality by the jurors.
In the present case, in support of his motion for a change of venue, the appellant introduced a number of newspaper articles from the Fayette County Times-Record and the Tuscaloosa News. The articles introduced by the appellant were released approximately a year before the appellant was brought to trial. They were neither inflammatory nor prejudicial to the appellant. *1052 There was no showing that the pretrial publicity had so saturated the community as to have a probable impact on the prospective jurors.
The appellant also failed to prove actual prejudice by the jury. An extensive and thorough voir dire examination was conducted wherein 6 veniremembers indicated that they had not heard or read about the offense. Of the remaining veniremembers, 8 prospective jurors who indicated that they may have been partial were struck for cause. The remaining veniremembers were individually questioned; 4 of these potential jurors were thereafter excused as the questioning revealed possible partiality. The others all stated that they could disregard any pretrial publicity and render a fair and impartial verdict based solely on the evidence presented at trial. Thus, the appellant has also failed to show the existence of any actual jury prejudice.
There has been no showing of "manifest error" by the trial court concerning the findings of impartiality of the jury and there has been no showing of abuse of discretion by the trial court in overruling the appellant's motion for a change of venue.

XVI.
The appellant argues that the introducton of allegedly cumulative and inflammatory photographs of the decedent's body vitiated the fairness of the trial and deprived him of reliable verdict. However, the location and condition of the wounds to the victim were relevant in the present case, because the appellant's defense was that he had not committed the murder and he argued that he did not have the sword. There was evidence that both a sword and knife had been used in the attack on the deceased; thus, as the prosecutor argued at trial, whether the wounds could have been caused by either or both of these weapons, and which weapon caused the death, became relevant. Moreover, the condition of the body was relevant because the appellant argued that he did not intend to murder the deceased, rather he intended to commit a robbery.
"As a general rule, photographs are admissible in evidence if they tend to prove or disprove some disputed or material issue, to illustrate or elucidate some other relevant fact or evidence, or to corroborate or disprove some other evidence offered or to be offered, and their admission is within the sound discretion of the trial judge. Fletcher v. State, 291 Ala. 67, 277 So.2d 882 (1973); Hopkins v. State, 429 So.2d 1146 (Ala.Crim.App.), cert. denied, 429 So.2d 1146 (Ala.1983); Godbolt v. State, 429 So.2d 1131 (Ala.Crim.App.1983); Carpenter v. State, 400 So.2d 417 (Ala.Crim.App.), cert. denied, 400 So.2d 427 (Ala.1981). Photographs which depict the character and location of external wounds on the body of a deceased are admissible even though they are cumulative and based upon undisputed matters. Wicker v. State, 433 So.2d 1190 (Ala.Crim.App.1983); Hopkins v. State; Hines v. State, 365 So.2d 320 (Ala.Crim.App.), cert. denied, 365 So.2d 322 (Ala.1978). The fact that a photograph is gruesome and ghastly is no reason to exclude its admission into evidence, if it has some relevancy to the proceedings, even if the photographs may tend to inflame the jury. Warrick v. State, 460 So.2d 320 (Ala.Crim.App.1984); Carpenter v. State; Richards v. State, 337 So.2d 171 (Ala.Crim.App.), cert. denied, 337 So.2d 173 (Ala.1976)."
Magwood v. State, 494 So.2d 124, 141 (Ala. Cr.App.1985), affirmed, 494 So.2d 154 (Ala. 1986), 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986). "There is irony in a convicted murder's contending on appeal that pictures of the corpse of his victim might have inflamed the jury. That risk `comes with the territory.'" Grice v. State, 527 So.2d 784, 787 (Ala.Cr.App.1988).
Although he appellant also argues that the trial court erred in allowing into evidence photographs depicting the crime scene, he failed to object to these photographs at trial; therefore, his objection as to these photographs is subject to the plain error doctrine. Rule 45A, Ala.R.App.P.[7] These photographs were relevant to show the *1053 location and exact details of the offense and were illustrative of a number of witnesses' testimony. "Perpetrators of crimes that result in gruesome scenes have reason to expect that photographs of those gruesome scenes will be taken and admitted into evidence." Jenkins v. State, 627 So.2d 1034, 1045 (Ala.Cr.App.1992), affirmed, 627 So.2d 1054 (Ala.1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1388, 128 L.Ed.2d 63 (1994). In the present case, although these photographs may have tended to inflame the jury, they had some relevancy and therefore were properly admitted into evidence.

XVII.
The appellant argues that the trial court repeatedly failed to question prospective jurors concerning their ability to set aside bias arising from publicity, personal relationships, or past events, and that its failure to do so violated his rights to due process, a fair trial, an impartial jury, and hampered his ability to exercise his peremptory challenges freely. Specifically, the appellant alleges that certain veniremembers made statements indicating that they may have had biases concerning the present case, but the trial court failed to further inquire into the possible biases. He refers to five specific potential jurors.
The appellant first refers to a potential juror who indicated that he had been an acquaintance of the decedent for a long time; he further indicated that he "would try" to follow the trial court's instructions in considering only the evidence in the case in arriving at a verdict. The appellant also submits that, during individual questioning, this potential juror was equivocal as to his ability to fairly consider the evidence because of his acquaintance with the victim's family. Thus, the appellant argues that the trial court should have further questioned this potential juror, sua sponte based on these responses. However, the record indicates that the appellant neither objected to the lack of questioning nor challenged this potential juror for cause. The potential juror was thoroughly questioned, and the appellant was in no way limited as to his ability to question him. This potential juror indicated that he would try "to the best of [his] knowledge" to render a fair and impartial verdict based on the evidence. He also responded that he thought he could disregard his prior general knowledge concerning the case. At the close of his questioning, the defendant himself asked this potential juror if he would be able to give him a fair trial if he were to sit on the jury, and the potential juror stated that he believed that he could. Although the record is silent as to which party exercised the peremptory challenge as to this juror, this potential juror did not sit on the jury.
Thus, the appellant has failed to show any prejudice that he might have suffered based on the trial court's failure to further question this potential juror. Moreover, as the potential juror's responses were consistent and straightforward, there is no indication that further questioning was necessary.
"The defendant is not entitled to jurors who are totally ignorant of the facts and issues involved in the case or to jurors who never entertained a preconceived notion as to the defendant's guilt or innocence. Ex parte Grayson, 479 So.2d 76, 80 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985). A defendant is entitled to a trial by jurors who can lay aside any preconceived impressions or opinions and render a verdict based on the evidence which is presented at trial, id."

Oryang v. State, 642 So.2d 989, 993 (Ala.Cr. App.1994). Cf. Williams v. State, 710 So.2d 1276 (Ala.Cr.App.1996) (the trial court's failure to sua sponte excuse a veniremember who had indicated that she had "one foot already over" on a verdict of guilt and a sentence of death was not error where the defendant allowed the veniremember to remain as an alternate on the jury; moreover, the defendant's reliance on Hunter v. State, 585 So.2d 220 (Ala.Cr.App.1991) was distinguishable in that the Hunter case "involved an erroneous denial by the trial court of a challenge for cause, which forced the defendant in that case to use a peremptory strike to correct the court's error."[8])
*1054 The appellant also argues that the trial court erred in failing, sua sponte, to further question a potential juror who indicated that her husband had been the victim of a stabbing a year before trial. The record indicates that the appellant did not object to the trial court's failure to question this potential juror; he also did not challenge this veniremember for cause. This failure to object weighs against any finding of prejudice. Kuenzel v. State, supra. The record indicates that, during individual questioning of this potential juror, the appellant determined that the veniremember's husband had been wounded in a previous stabbing. His ability to further question the potential juror concerning this matter was in no way limited, and there was no indication that further questioning was required. The potential juror stated that, if she were to be selected as a juror, she would base her judgment on the evidence presented at trial and the law as instructed by the trial court. Moreover, this record contains no jury strike list from which to determine which party struck this potential juror. Therefore, the appellant has failed to demonstrate any possible prejudice, Williams v. State, 710 So.2d at 1325, and his reliance on Hunter v. State is again misplaced. See footnote 8.
The appellant also argues that the trial court should have, sua sponte, further questioned a potential juror who indicated that her father had been murdered. The appellant neither objected to this failure to question at trial, nor did he raise a challenge for cause against this potential juror. This failure to object weighs against any finding of prejudice. Kuenzel v. State, supra. A review of the individual questioning of this potential witness indicates that she stated that, if she were to be selected as a juror, she would listen to the evidence and render a fair and impartial verdict based only on the evidence and the law as instructed by the trial court. This questioning does not demonstrate any need for further questioning concerning any possible bias. Moreover, this potential juror did not serve on the jury, and there is no indication in the record as to which party struck her from service. Thus, the trial court's failure to further question this veniremember was not error.
The appellant further complains of the trial court's failure to sua sponte further question two potential jurors concerning their biases: one who indicated that she had heard the decedent preach and another who had indicated that his nephew had been murdered. Following questioning by defense counsel of each of these veniremembers, the appellant challenged them for cause. The trial court granted both challenges; therefore, the appellant suffered no prejudice by the trial court's failure to further question them. Moreover, the appellant did not request further questioning and did not object to the trial court's failure to do so. There was no plain error on this ground.

XVIII.
The appellant argues that the trial court's failure to instruct the jury on the lesser included offense of intentional murder violated his rights to due process, a fair trial, and a reliable verdict. Specifically, the appellant alludes to the trial court's failure to give a charge on intentional murder as a lesser included offense of capital murder. The trial court charged the jury only as to felony murder as a lesser included offense. The appellant argues on appeal that the court's doing so "left the jurors with `no where to go,' except for the verdict of guilty on the capital murder charge, if they believed that Mr. Price shared an intent to kill but had not participated in a homicide during the charged robbery." The record indicates that the appellant failed to object on this ground at trial; therefore, any error must be analyzed pursuant to the plain error doctrine. Rule 45A, Ala.R.App.P.
There is no reasonable theory presented by the evidence to support a charge on intentional murder. The appellant appears to believe that, if he intended to kill the victim, but did not actually participate in *1055 the killing, remaining only an observer who was there to render aid if the need arose, and actively participated in only the robbery, he would be guilty of intentional murder rather than capital murder. However, in Alabama, an individual who is present with the intent to aid and abet in the commission of an offense is as guilty as the principle wrongdoer. § 13A-2-20, -23, Code of Alabama 1975. See Stokley v. State, 254 Ala. 534, 49 So.2d 284 (1950); Robinson v. State, 335 So.2d 420 (Ala.Cr.App.1976), cert. denied, 335 So.2d 426 (Ala.1976); Heard v. State, 351 So.2d 686 (Ala.Cr.App.1977); Hill v. State, 348 So.2d 848 (Ala.Cr.App.1977), cert. denied, 348 So.2d 857 (Ala.1977). "A conviction of one charged in the indictment with having been the actual perpetrator of a crime is authorized on proof of a conspiracy or that the accused aided and abetted in the commission of the crime. Stokley v. State, 254 Ala. 534, 49 So.2d 284 (1950). An aider and abettor would be indicted directly with the commission of the substantive crime and the charge may be supported by proof that he only aided and abetted in its commission. Pope v. State, 365 So.2d 369 (Ala.Cr.App. 1978)." Killough v. State, 438 So.2d 311 (Ala.Cr.App.1982), reversed on other grounds, 438 So.2d 333 (Ala.1983). As long as the appellant intentionally promoted or aided in the commission of the killing itself, whether he actually committed the murder does not affect his liability or his guilt. Lewis v. State, 456 So.2d 413 (Ala.Cr.App.1984). The trial court instructed the jury as to the laws of complicity and accomplice liability in the present case.
Moreover, the evidence presented is uncontradicted that the robbery occurred and that the appellant intended that the robbery occur. Thus, the robbery element of the offense was established. The jury was therefore given an alternative lesser included charge of felony murder, based on the theory that the appellant, although he intended to commit the robbery, did not intend to kill the decedent.
"The trial judge did not err in refusing to give the jury a charge on the lesser included offense of intentional murder. A trial judge may refuse to charge on a lesser included offense when it is clear to the judicial mind that there is no evidence to support the jury's being charged on the lesser included offense. Greer v. State, 475 So.2d 885, 890 (Ala.Cr.App.1985); Wesley v. State, 424 So.2d 648 (Ala.Cr.App.1982)." Gurganus v. State, 520 So.2d 170, 174 (Ala.Cr.App.1987). "Here, neither the evidence presented by the prosecution nor that presented by the defense provides a rational basis for a verdict of murder." Parker v. State, 587 So.2d 1072, 1083 (Ala.Cr.App.1991). Applying the logic set forth in Holladay v. State, 549 So.2d 122, 129-130 (Ala.Cr.App.1988), aff'd, 549 So.2d 135 (Ala.1989), cert. denied, 493 U.S. 1012, 110 S.Ct. 575, 107 L.Ed.2d 569 (1989), and substituting the present offense and pertinent facts for those set out in that case, it is clear that the evidence that makes the present case a capital offense, i.e., murder committed during a robbery in the first degree, is undisputed. The appellant acknowledges that the perpetrators intended to rob the victims and that the murder occurred during that robbery. There was no evidence presented that the victims were not robbed during the murder. The crime of intentional murder is automatically elevated to capital murder when it is committed during a robbery in the first degree. Therefore, if the evidence in this case showed that the appellant intentionally killed the victim during the commission of a first degree robbery, then the jury should convict the appellant of capital murder. If, as the appellant argued at trial, the evidence showed that the murder occurred unintentionally during the commission of a robbery in the first degree, then the jury should convict the appellant of felony murder. In the present case, there was no reasonable theory under the evidence presented at trial by the State or the appellant that could have supported a conviction of intentional murder. Therefore, the trial court was not required to give a charge on the lesser included offense of intentional murder.

XIX.
The appellant argues that considering robbery in the first degree both as an element of the capital offense and as an aggravating circumstance violated his rights *1056 to an individualized sentence and his protection against double jeopardy. The record indicates that the appellant failed to raise this issue until appeal; therefore, it is subject to the plain error standard of review. Rule 45A, Ala.R.App.P.
The consideration of robbery in the first degree as an aggravating circumstance in the present case, in which the appellant was convicted of capital murder for a murder committed during robbery in the first degree, did not result in an unconstitutional sentencing. This claim was raised in Ex parte Windsor, 683 So.2d 1042, 1060 (Ala.1996), cert. denied, 520 U.S. 1171, 117 S.Ct. 1438, 137 L.Ed.2d 545 (1997), and the Alabama Supreme Court stated:
"`The practice of permitting the use of an element of the underlying crime as an aggravating circumstance is referred to as "double-counting" or "overlap" and is constitutionally permissible. Lowenfield v. Phelps, 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988); Ritter v. Thigpen, 828 F.2d 662 (11th Cir.1987); Ex parte Ford, 515 So.2d 48 (Ala.1987), cert. denied, 484 U.S. 1079, 108 S.Ct. 1061, 98 L.Ed.2d 1023 (1988); Kuenzel v. State, 577 So.2d 474 (Ala.Cr.App.), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991).
"`Moreover, our statutes allow "double-counting" or "overlap" and provide that the jury, by its verdict of guilty of the capital offense, finds the aggravating circumstance encompassed in the indictment to exist beyond a reasonable doubt. See §§ 13A-5-45(e) and -50. "The fact that a particular capital offense as defined in section 13A-5-40(a) necessarily includes one or more aggravating circumstances as specified in section 13A-5-49 shall not be construed to preclude the finding and consideration of that relevant circumstance or circumstances in determining sentence." § 13A-5-50.'

"Coral v. State, 628 So.2d 954, 955-56 (Ala. Cr.App.1992). See also Burton v. State, 651 So.2d 641 (Ala.Cr.App.1993)."
Moreover, the fact that the evidence relating to the robbery offense served as an element of the offense as well as an aggravating circumstance for sentencing the appellant did not violate the appellant's rights against double jeopardy.
"`Section 13A-5-50, Code of Alabama 1975, states, in part, as follows:
"`"The fact that a particular capital offense as defined in section 13A-5-40(a) necessarily includes one or more aggravating circumstances as specified in section 13A-5-49 shall not be construed to preclude the finding and consideration of that relevant circumstance or circumstances in determining sentence."
"`Clearly, § 13A-5-50 provides that a jury may consider an element of capital murder as an aggravating circumstance if that element is listed in § 13A-5-49. Further, this court has repeatedly held that the use of an element o capital murder in such a way does not, as the appellant argues, punish a defendant twice for the same offense. Kuenzel, supra; see also Ex parte Kennedy, 472 So.2d 1106 (Ala.), cert. denied, 474 U.S. 975, 106 S.Ct. 340, 88 L.Ed.2d 325 (1985).
"`"A capital punishment scheme, under which the same felony may form the basis of an essential element of the crime and an aggravating circumstance for consideration by the jury in recommending a sentence, does not constitute a denial of the guarantee against double jeopardy."

"`Kuenzel, 577 So.2d at 488, quoting Fortenberry v. State, 545 So.2d 129, 142 (Ala.Cr.App.1988), aff'd, 545 So.2d 145 (Ala.1989), cert. denied, 495 U.S. 911, 110 S.Ct. 1937, 109 L.Ed.2d 300 (1990).'

"Burton v. State, 651 So.2d 641, 657-58 (Ala.Cr.App.1993), aff'd, 651 So.2d 659 (Ala.1994), cert. denied, 514 U.S. 1115, 115 S.Ct. 1973, 131 L.Ed.2d 862 (1995)."
Boyd v. State, 715 So.2d 825 (Ala.Cr.App. 1997).
Thus, this claim by the appellant did not constitute plain error.

*1057 XX.
The appellant argues that the aggravating circumstance that the offense was especially heinous, atrocious, or cruel when compared to other capital offenses was applied to his sentencing with insufficient limiting instructions and was, therefore, unconstitutionally vague. The record indicates that the appellant failed to object on this ground until this appeal; therefore, this claim must be reviewed pursuant to the plain error doctrine. Rule 45A, Ala. R.App.P. In the present case, the appellant relies on Maynard v. Cartwright, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988), in arguing that the trial court's jury instructions concerning the "especially heinous, atrocious, and cruel" statutory aggravating circumstance was unconstitutionally vague. However, the jury was extensively instructed as to the meaning of these terms and how they are to be applied in the context of capital sentencing. Similarly, in Haney v. State, 603 So.2d 368, 387 (Ala.Cr.App.1991), aff'd, 603 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993), the defendant relied on Maynard v. Cartwright, supra, in claiming that the trial court's instructions on this aggravating circumstance in her case were too vague to adequately guide the jury. This Court held that the instructions in Haney v. State, supra, at 385-86, were distinguishable from those in Maynard v. Cartwright, supra. This Court held:
"Unlike Maynard, the jury here was instructed on the meaning of the words of the aggravating circumstances in the context of capital sentencing. These instructions correctly followed the previously recognized limiting construction of the aggravating circumstance established by the Alabama Supreme Court in Ex parte Kyzer, 399 So.2d 330, 334 (Ala.1981), wherein the court sated: `The aggravating circumstance listed in § 13-1-6(8) [now § 13A-5-49(8)] was intended to apply to only those conscienceless or pitiless homicides which are unnecessarily torturous to the victim.' For other cases in which we applied the rule established in Ex parte Kyzer, see Hallford v. State, 548 So.2d 526 (Ala.Cr.App.1988), aff'd, 548 So.2d 547 (Ala.), cert. denied, 493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989); Bui v. State, 551 So.2d 1094 (Ala.Cr.App.1988), aff'd, 551 So.2d 1125 (Ala.1989). See also Ex parte Bankhead; Bush v. State, 431 So.2d 555 (Ala.Cr.App.1982), aff'd, 431 So.2d 563 (Ala.), cert. denied, 464 U.S. 865, 104 S.Ct. 200, 78 L.Ed.2d 175 (1983)."
Id., at 387.
In the present case, the trial court instructed the jury concerning this aggravating circumstance as follows:
"The other aggravating circumstance which you may consider in this case is, if you find from the evidence that it has been proved beyond a reasonable doubt, you may consider whether the capital offense was especially heinous, atrocious or cruel when compared to other capital offenses. The State asserts in this case the killing of Bill Lynn was especially heinous, atrocious, and cruel when compared to other capital murders. You will have to determine whether or not the evidence in this case, in fact, has proved beyond a reasonable doubt that, in fact, the killing of Bill Lynn was especially heinous, atrocious and cruel when compared to other capital murders.
"The term `heinous' means extremely wicked or shockingly evil. The term `atrocious' means outrageously wicked and violent. The term `cruel' means designed to inflict a high degree of pain with utter indifference to or even enjoyment of the suffering of others. What is intended to be included in this aggravating circumstance is only those cases where the actual commission of the capital offense is accompanied by such additional acts as to set the crime apart from the norm of capital offenses.
"For a capital offense to be especially heinous, atrocious or cruel, it must be a conscienceless or pitiless crime which is unnecessarily tortuous to the victim. All capital offense are heinous, atrocious, and cruel to some extent, but not all capital offenses are especially heinous, atrocious, cruel compared to other capital offenses.

*1058 "You should not find or consider this aggravating circumstance unless you find that this particular capital offense involved a conscienceless or pitiless crime which was unnecessarily torturous to the victim.
"Now, the fact that death has occurred or that a death scene may appear gruesome does not prove that the crime was especially heinous, atrocious, and cruel. Instead, the jury must determine if these elements are present based upon a careful and rational review of all the evidence that has been submitted to you during the trial of this case, both in the guilt/innocence phase and in the sentence phase of the case.
"As I stated to you before, the burden of proof is on the State to convince you beyond a reasonable doubt as to the existence of the aggravating circumstance asserted that the capital offense in this case was especially heinous, atrocious, or cruel when compared to other capital offenses."
These instructions are substantially the same as the relevant instruction in the "Proposed Pattern Jury Instructions Use in the Sentence Phase of Capital Cases Tried Under Act No. 81-178." A trial court's following of an accepted pattern jury instruction weighs heavily against any finding of plain error. Ex parte Harrell, 470 So.2d 1309, 1315 (Ala.1985), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985).
In the present case, there was no plain error as to the trial court's charge to the jury.

XXI.
The appellant argues that the trial court's finding that the defense failed to present a prima facie case of racial discrimination in the exercise of the State's peremptory challenges to prospective jurors was erroneous. The record indicates that, following the striking of the jury and before it was seated, the following transpired:
"[Defense counsel]: At this time, Your Honor, I would like to place on the record the information that during the selection process there were five black jurors who were available to us. The State struck three, number 59, number 66 and number 5, all being black females.... I ask that the race of each of those jurors be noted on the record and I would like the State to justify each of their strikes.
"THE COURT: Is that all you have?
"[Defense counsel]: Well, no sir. Based on the Sixth and the Fourteenth Amendments and my client's right to a fair cross-section, I would argue that by the elimination of those jurors, we no longer have a fair cross-section of his peers because the number has been diminished, ... leaving us with 2 black jurors out of 14 with 2 alternates not being the black ones. He has a right to a fair cross-section and I would argue that by their elimination he no longer has any fair cross-section. In cases as important as this, he is entitled.
"[Prosecutor]: I'd like to point out, Your Honor, that the venire that we began with was 10% black. We had 49 to strike from, of whom 5 were black. The number seated isof the jurors seated is 1/6 or 16% 16 2/3 black, and of those, including alternates, is 14% black, so based strictly on the number, it is a fair cross-section of the racial continuity of the venire itself.
"THE COURT: Do you have anything else to offer in support of your motion?
"[Defense Counsel]: No, nothing more than I've already argued. I just wanted to note it for the record.
"THE COURT: Then your motion will be denied.
"[Prosecutor]: Your Honor, could I ask you to include on the record whether or not the basis for your denial is that they have not made a prima facie showing of a racial discriminatory jury strike pattern?
"THE COURT: I think the record would reflect that.
"[Prosecutor]: Is that the basis of your ruling, sir?
"THE COURT: Yes."
Thus, the trial court held that the appellant failed to establish a prima facie case of racial discrimination. In support of the appellant's motion, the only assertion made by defense counsel was that there were five black potential jurors and the State *1059 struck 3 of them. Two blacks served on the appellant's jury, neither of whom were alternates. Defense counsel also made a blanket allegation that the appellant was deprived of a fair cross-section of his peers because the number of blacks on the venire panel had been diminished in arriving at the number of blacks actually serving on the appellant's jury.
"`A defendant claiming a Batson [v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986)] violation must make a prima facie showing that the prosecution used its peremptory strikes in a discriminatory manner. Jackson v. State, 594 So.2d 1289 (Ala.Cr.App.1991). Only when the defendant establishes facts and circumstances that raise an inference of discrimination must the state give its reasons for its peremptory strikes. Carter v. State, 603 So.2d 1137 (Ala.Cr.App.1992).'

"Stokes v. State, 648 So.2d 1179, 1180 (Ala. Cr.App.1994). We will reverse a trial court's ruling on a Batson motion only when that ruling is clearly erroneous. Ex parte Branch, 526 So.2d 609 (Ala.1987)."

Clemons v. State, 720 So.2d 961, 974 (Ala.Cr. App.1996).
In Edwards v. State, 628 So.2d 1021, 1024 (Ala.Cr.App.1993), the trial court found that the defendant had failed to establish a prima facie case of racial discrimination where there had been 6 black members on a 35-40 member venire, i.e., the venire was 15%-17% black. One black veniremember was removed for cause, and the State struck two blacks, apparently leaving three on the jury, so that blacks comprised 25% of the jury. The defendant objected based only on the fact that the State struck two blacks who had never answered any questions during voir dire questioning. The trial court held that the defendant had failed to make a prima facie showing of racial discrimination, stating:

"Batson, Ex parte Branch, 526 So.2d 609 (Ala.1987), and their progeny make it very clear that `"[t]he burden of persuasion is initially on the party alleging discriminatory use of peremptory challenges to establish a prima facie case of discrimination."' Ex parte Bird, 594 So.2d 676, 679 (Ala. 1991) (quoting Ex parte Branch, 526 So.2d at 622). Until this burden is met, the challenged party `is under no obligation to offer explanations for its peremptory strikes.' Jackson v. State, 594 So.2d 1289, 1292 (Ala.Cr.App.1991). See also Huntley v. State, 627 So.2d 1013 (Ala.1992). Merely showing that the challenged party struck one more members of a particular race is not sufficient to establish a prima facie case. Harrell v. State, 571 So.2d 1270, 1271 (Ala.1990), cert. denied, 499 U.S. 984, 111 S.Ct. 1641, 113 L.Ed.2d 736 (1991); Ashley v. State, 606 So.2d 187, 192 (Ala.Cr.App.1992); Jones v. State, 603 So.2d 419, 420-21 (Ala.Cr.App.1992). See also Hood v. State, 598 So.2d 1022, 1023 (Ala.Cr.App.1991). `When the evidence shows only that blacks were struck and that a greater percentage of blacks sat on the jury than sat on the lawfully established venire, an inference of discrimination has not been created.' Harrell v. State, 571 So.2d at 1271. The trial court properly denied the appellant's Batson motion."
Edwards v. State, supra, at 1024.
"`In Ashley v. State, 606 So.2d 187 (Ala.Cr.App.1992), the prosecution used three of its seven strikes to remove blacks from the pool of potential jurors. This court held that the "appellant failed to establish a prima facie case under Batson and Ex parte Branch [526 So.2d 609 (Ala.1987)] because the appellant failed to show any evidence of discrimination other than the number of blacks struck." Ashley, 606 So.2d at 192. Similarly in the present case, the only evidence presented to the trial court by the appellant was the fact that three out of the seven potential black jurors were struck by the prosecution. There was no evidence presented that any of the factors set out in Ex parte Branch, 526 So.2d 609 (Ala.1987), which may be used to establish a prima facie case, existed. The evidence presented at trial was not sufficient to prove a prima facie case of a Batson violation. The trial court did not *1060 err in denying the appellant's Batson motion.'
"Moore v. State, 677 So.2d 828, 829 (Ala. Cr.App.1996).
"`When determining whether a challenging party has shown a prima facie case of racial discrimination in the use of peremptory strikes, "the court is to consider `all relevant circumstances' which could lead to an inference of [such] discrimination." Ex parte Branch, 526 So.2d 609, 622 (Ala.1987). The challenging party "may establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial." Batson, 476 U.S. at 96, 106 S.Ct. at 1723 (emphasis added). Normally, the challenging party has not shown that the prosecution used its peremptory strikes in a racially discriminatory manner where the only evidence presented in support of a prima facie case of discrimination is the fact that blacks were struck by the prosecution. Ex parte Branch, 526 So.2d 609, 622-23 (Ala.1987), contains nonexclusive list of factors that a challenging party might use to establish a prima facie case of discrimination. This list includes, "[a] pattern of strikes against [jurors of a certain gender or race] on a particular venire; e.g., 4 of 6 peremptory challenges were used to strike black jurors." Branch, 526 So.2d at 623 (emphasis added). A pattern "`implies that the action at least in part "because of," not merely "in spite of," its adverse effects upon an identifiable group,' Hernandez [v. New York], 500 U.S. 352, 360, 111 S.Ct. [1859] at 1866 [114 L.Ed.2d 395 (1991)] (quoting Personnel Administrator of Massachusetts v. Feeney, 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979)) (footnote and citation omitted in Hernandez)." Freeman v. State, 651 So.2d 576, 583 (Ala.Cr.App.1994). When determining whether peremptory strikes were used in a manner to suggest discriminatory "pattern of strikes," "[m]erely showing that the challenged party struck one or more members of a particular race is not sufficient to establish a prima facie case [of discrimination]." Edwards v. State, 628 So.2d 1021, 1024 (Ala.Cr.App. 1993).'

"Bell v. State, 676 So.2d 1349, 1350 (Ala.Cr. App.1995) (Emphasis in original.)"
Clemons v. State, 720 So.2d at 975.
In the present case, the appellant relied solely on the number of strikes against blacks made by the State, without any supporting evidence indicating a discriminatory intent or purpose. Thus, the appellant has failed to make a prima facie showing of racial discrimination by the State in removing blacks from the jury.

XXII.
The appellant argues that the trial court's denial of his motion to quash the indictment, which was based on the composition of the grand jury, without affording him an adequate opportunity to conduct discovery, denied him of his rights to due process, a fair trial, equal protection, and a jury comprised of a fair crosssection of the community. Specifically, the appellant refers to the motion hearing held pursuant to his motion to quash the indictment, at which the trial court stated that the defense had not shown the necessary statistics and evidence in support of its claim and denied the motion. The appellant complains that the trial court denied the motion without providing him the time to conduct discovery or otherwise to gather the relevant facts. However, the record indicates that the appellant failed to request any additional time. Therefore, he raises this issue for the first time on appeal, and this issue must be analyzed pursuant to the plain error doctrine. Rule 45A, Ala.R.App.P.
"The guidelines for determining whether a trial court has abused its discretion in denying a continuance are set out in Ex parte Saranthus, 501 So.2d 1256, 1257 (Ala.1986):
"`A motion for a continuance is addressed to the discretion of the court and the court's ruling on it will not be disturbed unless there is an abuse of discretion. Fletcher v. State, 291 Ala. *1061 67, 277 So.2d 882 (1973). If the following principles are satisfied, a trial court should grant a motion for continuance on the ground that a witness or evidence is absent: (1) the expected evidence must be material and competent; (2) there must be a probability that the evidence will be forthcoming if the case is continued; and (3) the moving party must have exercised due diligence to secure the evidence. Knowles v. Blue, 209 Ala. 27, 32, 95 So. 481, 485-86 (1923).'"
Fortenberry v. State, 545 So.2d 129, 138 (Ala. Cr.App.1988), affirmed, 545 So.2d 145 (Ala. 1989), cert. denied, 495 U.S. 911, 110 S.Ct. 1937, 109 L.Ed.2d 300 (1990).
In the present case, the appellant has failed to make a showing of good cause as to any of the three principles required to support the granting of a motion for a continuance. The appellant has failed to show that the expected evidence was material or competent, that there was a probability that the evidence would be forthcoming (especially as the appellant has yet to produce any evidence in support of this motion), and that the party exercised due diligence in securing the evidence, because the motion was filed on September 18, 1992, and the hearing was ultimately held on December 15, 1992.
"Trial judges necessarily require a great deal of latitude in scheduling trials. Not the least of their problems is that of assembling the witnesses, lawyers, and jurors at the same place at the same time, and this burdens counsels against continuances except for compelling reasons. Consequently, broad discretion must be granted trial courts on matters of continuances."
Morris v. Slappy, 461 U.S. 1, 11-12, 103 S.Ct. 1610, 1616-17, 75 L.Ed.2d 610 (1983) (discussing a defendant's claim that his Sixth Amendment right to counsel was violated by a trial court's failure to grant his counsel additional time to investigate). See also Ex parte Hays, 518 So.2d 768, 771-72 (Ala.1986).
In the present case, especially in light of the evidence presented at the motion hearing, it is clear that the trial court did not abuse its discretion in denying the appellant's motion. The appellant presented no evidence to support this motion as required by Duren v. Missouri, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), and absent any proof, such a claim must be rejected. White v. State, 587 So.2d 1218, 1222 (Ala.Cr.App. 1990), affirmed, 587 So.2d 1236 (Ala.1991), 502 U.S. 1076, 112 S.Ct. 979, 117 L.Ed.2d 142 (1992). Moreover, the trial court's failure to sua sponte grant the appellant additional time to investigate this claim did not constitute plain error. "[W]e find it extremely improbable that the additional time for preparation requested by the defendant would have changed the result of the trial and that the defendant has not met his burden of showing actual prejudice in the defense of the charge for which he was convicted." Fortenberry v. State, supra, at 139.

XXIII.
The appellant argues that the limitation placed on the amount of compensation receivable by counsels representing indigent defendant in Alabama violates the United States Constitution and Alabama law. Specifically, the appellant argues that this limitation deprives him of his Sixth Amendment right to the effective assistance of counsel and also violates the separation of powers doctrine, as well as his rights to due process and equal protection of the law. However, this claim has previously been decided adversely to the appellant. See Ex parte Grayson, 479 So.2d 76, 80-81 (Ala.1985), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985); Smith v. State, 581 So.2d 497, 526-29 (Ala. Cr.App.1990), reversed on other grounds, 581 So.2d 531 (Ala.1991). Moreover, the appellant's argument that the statute limiting counsel's compensation constitutes a "taking" of his attorney's property without providing just compensation has similarly been resolved adversely to the appellant. Smith v. State, 698 So.2d 189 (Ala.Cr.App.1996), aff'd, 698 So.2d 219 (Ala.1997). Similarly, in Smith v. State, supra, this Court also held that the compensation limitations on out-of-court time do not constitute an unconstitutional denial of the effective assistance of counsel.

XXIV.
As required by § 13A-5-53, Code of Alabama 1975, we address the propriety of the *1062 appellant's conviction and sentence of death. The appellant was indicted and convicted of capital murder, see § 13A-5-40(a)(2), Code of Alabama 1975, for intentionally causing the death of Bill Lynn during a robbery in the first degree.
The record reflects that the appellant's sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor. See § 13A-5-53(b)(1), Code of Alabama 1975.
A review of the record shows that the trial court correctly found the existence of two aggravating circumstances: that the capital offense was committed during a robbery, and that the capital offense was especially heinous, atrocious, and cruel when compared to other capital cases. Considering the evidence of the circumstances surrounding the victim's murder, it is clear that it was unnecessarily torturous, pitiless, conscienceless, extremely wicked, and shockingly evil. The trial court correctly found the existence of two statutory mitigating circumstances: that the defendant had no significant history of prior criminal activity and that the defendant was 19 years old at the time of the offense. The trial court also correctly found the existence of three non-statutory mitigating circumstances: that the defendant's father was murdered when the defendant was a small child; that the defendant had been verbally, physically, and possibly sexually abused by a number of his mother's live-in companions; and that the defendant had been diagnosed as having an antisocial personality and as having been emotionally disturbed from an early age. The trial court also took into consideration the instability of his home life and the traumatic events during his early years. The trial court weighed the mitigating and aggravating circumstances and properly determined that the aggravating circumstances outweighed the statutory mitigating circumstances and nonstatutory mitigating circumstances. We agree with the trial court's findings.
As required by § 13A-5-53(b)(2), Code of Alabama 1975, this Court must independently weigh the aggravating and mitigating circumstances to determine the propriety of the appellant's death sentence. After an independent weighing this Court is convinced that the appellant's sentence of death is the appropriate sentence.
As § 13A-5-53(b)(3), Code of Alabama 1975, provides, we must also address whether the appellant's sentence was disproportionate or excessive when compared to sentences imposed in similar cases. The appellant's sentence was neither. See Kuenzel v. State, So.2d 474 (Ala.Cr.App.), affirmed, 577 So.2d 531 (Ala.1991), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991); Brown v. State, 545 So.2d 106 (Ala. Cr.App.), affirmed, 545 So.2d 122 (Ala.1989), cert. denied, 493 U.S. 900, 110 S.Ct. 257, 107 L.Ed.2d 206 (1989); Hallford v. State, 548 So.2d 526 (Ala.Cr.App.1988), affirmed, 548 So.2d 547 (Ala.), cert. denied, 493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989). Two-thirds of the death sentences imposed in Alabama involve cases of robbery-murder. Beck v. State, 396 So.2d 645, 654 n. 5 (Ala. 1980).
We have searched the entire record for any error that might have adversely affected the appellant's substantial rights and have found none. Rule 45A, Ala.R.App.P.
The appellant received a fair trial. Therefore, the judgment of the circuit court is due to be, and it is hereby, affirmed.
AFFIRMED.
BROWN, J., concurs.
COBB and BASCHAB, JJ., concur in result only without opinion.
LONG, P.J., recused.
NOTES
[1] Robbery in the first degree is not subject to review under the plain error rule, Rule 45A, Ala.R.App.P.; our review pursuant to the plain error rule will address only the conviction of capital murder for the killing of Bill Lynn.
[2] Although the trial court orally sentenced the appellant to life imprisonment as to the robbery conviction, the case action summary reflects that the trial court in fact sentenced the appellant to life imprisonment without parole as to this conviction.
[3] It should be noted that this language from Arthur was not the basis for reversal in that opinion, but was quoted to "draw[] attention to statements made by the prosecutor, which should be avoided. In finding these comments were inappropriate and improper, this court did not hold that they constituted reversible error. This court continued, in dicta, to make mention of other possible and potential problems to be addressed on retrial." Arthur v. State, 711 So.2d 1031, 1073 (Ala.Cr.App.1996).
[4] The burden of proof as to the propriety of the search falls on the state.
[5] The comment made by the prosecutor during the guilt phase in Ex parte Smith, 581 So.2d at 532, was as follows:

"Now, ladies and gentlemen, if this defendant ever gets loose again, he's going to do it again he's going to kill, and he's going to kill again. And I would ask you to consider that, because, ladies and gentlemen, only you can stop him for sure."
[6] The appellant did make a pretrial motion to suppress his statements, but the ground of improper inducement raised on appeal was not cited as a specific ground for that motion.
[7] Thus, this claim is waived as to the robbery conviction. See n. 1 above.
[8] The appellant in the present case also relies on Hunter v. State; however, that case is also distinguishable from the present case in that the appellant failed to make a challenge for cause of the veniremember, nor is there an indication in the record that he used a peremptory strike against this potential juror.